JOHN A. WARNER, A CITIZEN OF THE STATE OF PENNSYLVANIA; JOHN A. WARNER AND COMPANY, CITIZENS OF THE SAME STATE; AND WILLIAM HEALD, JACOB HEALD, RESIDING OUT OF THE JURISDICTION OF THE CIRCUIT COURT OF PENNSYLVANIA, SAMUEL WOODWARD, AND A. J. BUCKNER, CITIZENS OF THE SAME STATE, TRADING UNDER THE FIRM OF HEALD, WOODWARD, AND COMPANY, APPELLANTS, *v.* THOMAS P. MARTIN, A CITIZEN OF THE STATE OF VIRGINIA, WHO SURVIVED SPENCER FRANKLIN, ALSO A CITIZEN OF THE STATE OF VIRGINIA, LATELY TRADING UNDER THE FIRM OF MARTIN AND FRANKLIN.

Where a merchant, in order to secure himself from loss, took merchandise from a factor, with a knowledge that the factor was about to fail, the principal who consigned that merchandise to the factor may avoid the sale, and reclaim his goods, or hold the merchant accountable for them.

And where the purchase was made from the factor's clerk, who had been left by the factor in charge of the business, this was an additional reason for avoiding the sale; because a factor cannot delegate his authority without the assent of the principal.

A factor or agent, who has power to sell the produce of his principal, has no power to affect the property by tortiously pledging it as a security or satisfaction for a debt of his own, and it is of no consequence that the pledgee is ignorant of the factor's not being the owner. But if the factor has a lien upon the goods he may pledge them to the amount of his lien.

Under any of these irregular transfers, a court of equity will compel the holder to give an account of the property which he holds.

Nor can a factor sell the merchandise of his principal to a creditor of the factor in payment of an antecedent debt. Such a transfer is not a sale in the legal acceptation of that term.

The power of a factor explained.

These principles of the common law are sustained by a statute of the State of New York passed in April, 1830 (3 Revised Laws, Appendix, p. 111).

THIS was an appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania, sitting as a court of equity.

In the early part of the year 1841, there was a commercial firm in the city of Richmond, Virginia, trading under the name of Martin & Franklin, who were dealers in tobacco and manufacturers of the article. There was at the same time a firm in Philadelphia, composed of the persons named in the caption of this statement, trading under the name of Heald, Woodward, and Company. There was also a firm in New York, trading under the name of Charles Esenwein and Company, although consisting of Charles Esenwein alone; and in Philadelphia there was also a commercial house, known by the name of John A. Warner and Company, although consisting of John A. Warner alone.

To the house of Charles Esenwein and Company in New York, Martin & Franklin were in the habit of consigning manufactured tobacco for sale, as their agents and factors.

18*

In April, 1841, Martin & Franklin opened a correspondence with Heald, Woodward, & Co., which resulted in the latter house becoming the agents of the former, for the purpose of selling their manufactured tobacco, in Philadelphia, as agents and factors.

In April, 1841, Martin & Franklin made the first shipment upon a new account to Charles Esenwein & Co., in New York, and continued, at intervals during the summer, to make more consignments. Their practice was, at each shipment, to draw a draft upon Esenwein & Co., payable in four months, for an estimated portion of the proceeds of sale. Amongst other drafts were the following, viz. : —

| 1841, May 27, | at four months, | due September 30, | for | $ 800. |
|---|---|---|---|---|
| " June 12, | " " | " October 15, | " | 700. |
| " July 3, | " " | " November 6, | " | 300. |
| " July 29, | " " | " December 2, | " | 850. |

These drafts were not paid by Esenwein & Co. at maturity. The tobacco shipped during the period when these drafts were drawn was the following, viz. : —

*Statement of Tobacco received by Charles Esenwein & Co. from Messrs. Martin & Franklin, of Richmond, Va., to sell for their account.*

1841.

|  |  | Whole Boxes. | Half Boxes. |
|---|---|---|---|
| May 12. Received ex schooner Manchester : | | | |
| 36 whole boxes T. P. Martin's 8's lump, | | | |
| 34 do. do. do. 16's " | | | |
| 20 do. do. do. 32's " | .... 90 | | |
| June 7. Received ex schooner Lynchburg : | | | |
| 20 whole boxes T. P. Martin's long 12's lumps, | | | |
| 16 do. do. H. Wit & Son, 16's " | | | |
| 26 do. do. T. P. Martin's 16's " | 62 | | |
| June 29. Received ex schooner Manchester : | | | |
| 8 whole boxes T. P. Martin's 16's lump, | | | |
| 56 half do. do. 32's " | .......8 | 56 | |
| July 8. Received ex schooner Leontine : | | | |
| 28 half-boxes T. P. Martin's 32's lumps, | ..........28 | | |
| Aug. 15. Received ex schooner Weymouth : | | | |
| 2 whole and 76 half boxes T. P. Martin's 32's, | 2 | 76 | |
| Received in all, boxes | ..... 162 | 160 | |

In August, 1841, Esenwein was in embarrassed circumstances, and sailed for Europe, leaving his business under the management of his clerk, Engelbert Caprano.

On the 3d of September, 1841, the house of Charles Esen-

wein & Co. failed. On the day before the failure, Esenwein
& Co. were indebted, amongst other persons, to the firm of
John A. Warner & Co. of Philadelphia, and Charles Conolly
of New York. At some short time before the failure, Warner
went to New York and got tobacco out of the store of Esen-
wein & Co., and in his account with that house the following
entries appeared as credits to Esenwein & Co.:—

1841.

| | | | |
|---|---|---|---:|
| Sept. 2. | By sundry notes, | | $11,977.69 |
| " 2. | sundries, | | 27,010.46 |
| " 2. | sundries, | | 2,654.98 |
| " 2. | S. Austin's note due Dec. 31 – 3 Jan. 1842, | | 435.47 |
| " 2. | transfers of Loomis & Hale's account, | | 120.59 |
| " 2. | do. J. M. Brineler's account, | | 203.00 |
| " 2. | do. D. W. Warning's account, | | 796.85 |
| " 2. | o. S. Mayer's account, | | 1,208.99 |
| " 2. | do. J. Barber & Co.'s account, | | 494.15 |
| " 2. | do. A. Snowhill & Son's account, | 1,089.75 |
| " 2. | do. A. Snowhill's account, | | 125.53 |
| | Amount carried over, | $97,444.20 | $95,871.77 |

| | | | |
|---|---|---:|---:|
| | Amounts brought forward, | $97,444.20 | $95,871.77 |
| Sept. 2. | By cash received Aug. 14, | | 160.00 |
| " 2. | To net proceeds of tobacco, | 1,198.00 | |
| " 2. | do. do. of cigars, | 45.70 | |
| " 2. | To difference in bill tobacco, Sept. 2, 1841, | 161.69 | |
| " 2. | By balance, | | 2,817.82 |
| | | $98,849.59 | $98,849.59 |

1841.

Sept. 2. To balance, . . . . $2,817.82

When the failure took place, Caprano made an assignment
to Charles Conolly, and among other things assigned seventeen
whole boxes and twelve half-boxes of the tobacco which had
been consigned by Martin & Franklin, that being the whole
amount of their tobacco then on hand.

On the 6th of September, 1841, the following transaction
occurred between John A. Warner & Co. and Heald, Wood-
ward, & Co.

In the account between these two firms, Warner & Co.
have a credit entered under date of September 6, as fol-
lows:—" Sept. 6. Sundries, $22,441.52."

This transaction is in part explained in the answer of Heald,
Woodward, & Co.

" The defendants, now and at all times, saving all exceptions for further answer to said bill of complainants, say :

" That in the month of September, A. D. 1841, they purchased of John A. Warner, as before they have answered, a large quantity of goods, and, among other things, two hundred and fifty-eight boxes of tobacco, known by the name of Martin's tobacco, and no more ; this being the whole number of boxes or half-boxes of tobacco either sold or delivered by said Warner· to defendants about that time, branded with the names or initials of complainant, or at all answering the description in complainant's bill, or inquired about therein ; that of said tobacco there was redelivered to said Warner before the filing of complainant's bill, or he failed to deliver, one hundred and thirty-four boxes, (as to which 134 boxes of tobacco, the said contract of· sale between said Warner and these defendants was by mutual consent annulled and rescinded,) leaving in the hands of, or under the control of, these defendants, at the time of filing of said bill, only one hundred and twenty-four boxes or half-boxes of said tobacco, or the proceeds thereof, and which said one hundred and twenty-four boxes were branded with the name or initials of complainant, as defendants believe, though of this they have no certain knowledge. And these defendants purchased the said tobacco of said Warner about September 6th, 1841, at the following prices, to wit, one hundred and six boxes thereof of lumps 8's, 12's, 16's, being 13,676 pounds, at 12 cents per pound, viz. $ 1,640.12 ; and eighteen boxes lumps 32's, at 16 cents per pound, viz. $ 230.40 ; making together $ 1,870.52.

" And they further aver and repeat, that they purchased the same fairly and *bonâ fide* of said Warner, and for full value, and that they had no knowledge whatever at the time, that said tobacco or any part thereof belonged to complainant, nor had they any reason to believe or know it. And further, the defendants say that the price paid by them for said tobacco is truly set forth and alleged as above, and the same was received by them and sold by said Warner to be placed by them to the credit of his account, and in part payment of, and not as security for, a debt due these defendants by said Warner, and which debt is not yet fully paid."

On the return of Charles Esenwein from Europe, he obtained a reassignment from Conolly of the seventeen whole and twelve half boxes of tobacco which belonged to Martin & Franklin, sold them, and remitted the proceeds to that house in Richmond.

On the 13th of September, 1841, Martin & Franklin wrote to Heald, Woodward, & Co. the following letter : —

Warner et al. *v.* Martin.

"*Richmond, Sept. 13th, 1841.*

" Messrs. Heald, Woodward, & Co., *Philadelphia.*

" Gentlemen, — I am just from New York, looking after our tobaccos that we had shipped on consignment to Charles Esenwein. Mr. E. Caprano, their clerk, that holds a power of attorney from Esenwein & Co., handed me a memorandum of tobacco sold; amongst those is John Warner & Co., of Philadelphia, ' sold them on the 2d of September, 250 boxes of our tobacco, 234 boxes branded Thomas P. Martin, and 16 boxes branded H. Wit & Son.'

" We have inclosed the memorandum; it is not signed; but Mr. Spear, of New York, will testify to the writing. His attorney informed one of us (Martin) that it was sold for cash, which is not likely, as the house failed on the next day; and we also observed in the assignment made in Philadelphia that Messrs. Warner & Co. are further secured in the first class made soon after. We wish to beg the favor of you to get the opinion for us of some able counsel, whether we can claim this tobacco, fraudulently taken from us under the cover of a cash sale, evidently to secure themselves at our loss. We had made drafts on them, of which about $ 2,000 has been paid, and they have sold about half that amount to other persons, for which they had heretofore charged a guaranty commission. Any expenses you may have to pay will be cheerfully allowed, by your obedient servants,        Martin & Franklin.

" N. B. We have omitted mentioning, in the event the attorney thinks as we do, you will set him about it at once, on our account, for which you will please be responsible for us.

"Martin & Franklin."

To which letter they received the following answer: —

"*Philadelphia, Sept. $\frac{15}{16}$th, 1841.*

" Messrs. Martin & Franklin.

" Gentlemen, — Your favor of the $\frac{13}{15}$th inst. came duly to hand, and in reply thereto we proceed to give you information in relation to the tobacco sold by C. Esenwein & Co., of New York, to Messrs. Warner & Co. of this city.

" The latter house, we are told, loaned to Esenwein their notes and cash to the amount of $ 50,000, and something over; they were induced to make this loan in consequence of representations by Esenwein, that this amount would be sufficient to enable his house to meet all their liabilities until he could have time to get to Europe and remit home sufficient funds to return the loan. After Esenwein had left the United States, Mr. Warner was satisfied in his own mind that he had

been deceived by him, and in order to secure himself from ruin he proceeded to purchase a sufficient amount of property from the attorney left by Esenwein in charge of his business.  We were pained to learn that you were among the sufferers, and that you will not in all probability be able to recover any portion of the tobacco which you state was sold to Mr. Warner, as we believe the whole matter was arranged under the advice of eminent counsel engaged by Mr. Warner both in New York and this city.

" We think, therefore, that any attempt made to recover the tobacco would be attended with great expense, and in the end prove fruitless.

" Very respectfully, your obedient servants,

" HEALD, WOODWARD, & Co."

In April, 1842, Martin & Franklin filed their bill in the Circuit Court of the United States for the Eastern District of Pennsylvania against Heald, Woodward, & Co. and Warner. They alleged the shipment of the tobacco to Esenwein & Co.; the drawing of the bills; that, with full knowledge of the insolvency of Esenwein & Co., Warner had obtained possession of the tobacco, knowing it to be the property of Martin & Franklin; that shortly afterwards he transferred the said tobacco to Heald, Woodward, & Co., who also knew that it belonged to the complainants; that at the time of this transfer, Heald, Woodward, & Co. were the agents and correspondents of Martin & Franklin, and, as such, bound to protect their interests; and that when the letter of the 16th of September was written, Heald, Woodward, & Co. had in their possession the tobacco which they knew to be the property of the complainants.  The bill then prayed for an account, &c.

The answers first filed by the respondents were objected to as insufficient, and the exceptions sustained.

On the 1st of March, 1843, Warner filed a further answer. He alleged that his purchase of the tobacco from Esenwein & Co. was *bonâ fide*, and according to the usual course of dealings between them; that the departure of Esenwein was publicly known, and was for the purpose of obtaining a loan from his relatives in order to carry on his business; that he had never applied for the benefit of the insolvent law, but was then carrying on his business in New York; that he sold the tobacco to Heald, Woodward, & Co. in the usual course of the dealings which had long existed between them, and not for the payment of any preëxisting debt; and that all accounts between them were regularly balanced and settled from time to time.

Heald, Woodward, & Co., in their answer, denied all agency, except for the tobacco which had been specially consigned to their house.

On the 11th of April, 1843, the cause was referred to a master to take depositions, and a commission to take testimony was issued to New York. It is only necessary to give an extract from the deposition of Charles Conolly, a creditor of the firm of Esenwein & Co., and to whom the assignment was made which has been already spoken of.

He deposed as follows : —

" After Mr. Esenwein left New York, Mr. Warner made purchases of that house in that store; he got tobacco out of the store of Esenwein after Esenwein left, but I could not swear that that tobacco was there when Esenwein left New York for Europe. I do not recollect the marks or numbers of any parts or quantities of them; they were in boxes, in kegs, and in bales ; it had, I presume, been shipped from Virginia to Mr. Esenwein. I have, since that occurred, heard him say whose brands they were; he mentioned various manufacturers, among the rest were Martin & Franklin; I don't recollect that he mentioned how much of it was Martin & Franklin's brand. Tobias Beehler was in New York at the time Warner got these goods. I did not see Mr. Warner getting them out; I saw Mr. Beehler getting them out. I can't say with certainty whose brands or marks were on the tobacco Beehler was assisting in getting out. On the day I saw Mr. Beehler helping to get out those goods, I did not see Mr. Warner in New York, and understood he had left that morning or the day before; they were not to my knowledge working night as well as day in getting out this tobacco ; I presume I made a great many particular remarks on the subject of taking away that tobacco. I recollect making the remark that the proceedings were wrong ; it was in the forenoon that I saw Beehler taking away the goods; I saw considerable quantities going out of the store; the whole appearance of the store was wrong, it was upside down, it was done in an unbusiness-like manner; in other words, things were taken out harum-scarum on the day succeeding the failure, or the next day after, and that I suppose occasioned the remark."

On the 25th of September, 1848, the Circuit Court pronounced the following decree : —

" This cause having been heard and debated before the judges, by counsel on both sides, on the 25th, 26th, 27th, and 28th of April last, upon the bill, answers, and proofs taken in the cause, the court do order and decree, that the defendants do pay to the complainant the sum of $ 2,869.14, with interr

est from the 25th of September, 1848, this being the amount of such of the bills of exchange accepted by Esenwein & Co. upon the tobacco shipped to the said Esenwein & Co., as were paid by the complainant, together with the charges of protest and reëxchange by them incurred and borne by reason of the non-payment of such acceptances by said Esenwein & Co.; deducting therefrom the balance which would have been payable to Esenwein & Co. by the complainant, if the said acceptances had been paid by said Esenwein & Co.; interest being charged for and against the parties according to law.

"Per cur.                                       R. C. GRIER,
                                                      J. K. KANE."

From this decree, an appeal brought the case up to this court.

It was argued by *Mr. Fallon*, for the appellants, and *Mr. Wharton*, for the appellee.

Much of the argument consisted in an examination of the facts in the case. The following points of law were then made.

The counsel for the appellants made the following points.

1st. That complainant had, on his own showing, a complete remedy at law, and that he is not entitled to the relief prayed for by him, in equity. Earl of Derby *v.* Duke of Athol, 1 Vesey, 205. Discovery may be granted, and yet relief refused. 1 Sim. & Stu. 519.

2d. That Charles Esenwein or his firm was a necessary party to the bill, and that the failure to make him such party is a fatal defect. Plunket *v.* Penson, 2 Atk. 51; 1 Paige, 215; Story's Eq. § 1526.

3d. That it was not too late to take advantage of these matters on the hearing. Story *v.* Livingston, 13 Peters, 375; Innes *v.* Jackson, 16 Vesey, 356; 1 Dan. Chancery Pr. 389, 390; Welford's Eq. Pleading, 414. At least so far as the bill prays for relief. 1 Maddock's Chan. 160, 174; 2 Vesey, 519. Russell *v.* Clark, 7 Cranch, 69; 1 Vesey, 205; Mitford's Chan. 225, 286; Mitchell *v.* Lenox, 2 Paige, 280.

4th. That the bill, answer, and proof fail to make out a case entitling the complainant to the relief prayed for.

5th. That the sale by Esenwein & Co. to Warner was perfectly valid as against complainant. Wright *v.* Campbell, 4 Burr. 2046; George *v.* Clagett, 7 Term Rep. 359; 2 Smith's Leading Cases, 77, and cases there cited; Urquhart *v.* McIver, 4 Johns. 103; De Lisle *v.* Priestman, 1 Browne's Rep. 176; Story on Bailments, 215–217.

6th. That the sale to Heald, Woodward, & Co. was perfectly valid as against complainant. Same cases as to fifth point are cited.

7th. That there is no evidence that Warner at the time of his purchase knew of the alleged ownership of complainant in the tobacco, and that the facts relied on by the court below as sufficient to put him on inquiry, are insufficient for that purpose.

8th. That the court were equally in error with regard to Heald, Woodward, & Co., as well as in saying that they had full knowledge of the true nature of the transaction by which Warner obtained possession of the goods, and that they had paid nothing for them till after notice of complainant's claim.

9th. That the court erred in assuming the four drafts on Esenwein & Co. as paid by complainant, as also in assuming that the tobacco consigned to Esenwein, and mentioned in the bill, corresponded with or formed part of that sold to Warner. 1 Smith's Chancery Pr., in notes.

10th. That in any event the acceptance of the drafts by Esenwein & Co. to an amount greater than the value of the tobacco, those drafts being outstanding, makes the sale by Esenwein perfectly valid as against complainant, and at least complainant cannot recover in this bill without showing that before filing it he had offered to do equity by tendering the drafts, having previously paid them. Daubigny *v.* Duval, 5 T. R. 604; Urquhart *v.* McIver, 4 Johns. 103; 6 Paige, 121, 122.

*Mr. Wharton,* for the appellee.

I. That a court of equity has jurisdiction. (The numerous authorities on this point are omitted.)

II. In reply to the objection that Esenwein ought to have been a party to the bill, Mr. Wharton contended, —

1. That Esenwein was not a necessary party.

The cases upon this subject are very numerous. It is probably sufficient to refer to the general rules laid down by elementary writers.

It is not an interest in the subject-matter of the suit, but in the object, that makes a party a necessary party. Calvert on Parties, 5, 6, 10, &c.; Story's Equity Pleading, § 72.

The objects of this suit were, — 1. Discovery; 2. Account; 3. Relief, in the restoration of the value of the property to the complainants. Now Esenwein was not a necessary party for either of these purposes.

Again, he was out of the jurisdiction of the court, and no decree was sought against him. Story, §§ 79, 80, 81, &c.; Joy *v.* Wirtz, 1 Wash. C. C. 517.

If a decree can be made without affecting the rights of a person not made a party, or without his having any thing to perform necessary to the perfection of the decree, the court will proceed without him, if he is not amenable to their process, or no beneficial purpose is to be effected by making him a party. Bailey *v.* Inglee, 2 Paige, 278; Mallow *v.* Hinde, 12 Wheaton, 193; Russell *v.* Clark, 7 Cranch, 96; Cameron *v.* M'Roberts, 3 Wheaton, 591.

Esenwein was, on his return to this country, examined as a witness by the complainant, and cross-examined by the defendants, who, it is submitted, thereby waived any exception, on the score of his not being a party.

2. The objection was at all events too late. Story *v.* Livingston, 13 Peters, 375; Robinson *v.* Smith, 3 Paige, 222; Watertown *v.* Cowen, 4 Paige, 510; Alderson *v.* Harvey, 12 Alabama, 580.

The 47th, 51st, 52d, and 53d Rules of Practice for the Courts of Equity of the United States were also referred to.

III. It is submitted that, upon the merits, the defendants have no case for the favorable consideration of a court of equity.

It was not denied that the complainant was the owner of two hundred and fifty-six boxes of tobacco, and that Warner got possession of them and delivered them to Heald, Woodward, & Co.

The points presented by the defendant's answer, and argued for them on the hearing, in reply to this *primâ facie* case, were, —

That Warner purchased this tobacco for a valuable consideration of a person who appeared to be the owner, and therefore had a right to retain it, and to transfer the property to Heald, Woodward, & Co.

In reply to this, it is contended, —

1st. That this was not a purchase for a valuable consideration, by a stranger, on the faith of ownership in the vendor.

2d. That before the factor's acts, such a transaction would not have conferred a title to the property on the defendants.

3d. That the factor's acts do not protect the defendants.

4th. That Heald, Woodward, & Co., being the agents of the complainant, could not acquire title to the property of their principal, to the prejudice of the latter.

1st. This point was established by an examination of the answers, exhibits, and evidence.

2d. The authorities cited upon this point were the following. Russell on Factors, &c. 56, 139; 2 Kent's Comm. 622, 623; Guerrero *v.* Peile, 3 Barn. & Ald. 616; Shipley *v.* Kymer, 1

Maule & Selw. 484; Howard v. Chapman, 4 C. & P. 508; Hudson v. Granger, 5 Barn. & Ald. 27, 33; Sims v. Bond, 5 Barn. & Adolph. 389, 393; Moore v. Clementson, 2 Campb. 22; Russell on Factors, p. 116, Part III.; Fielding v. Kymer, 2 Brod. & Bingh. 639; Story on Agency, § 113 and note, §§ 225, 486; Paley on Agency, by Lloyd, 340, 341, 342; De Bouchout v. Goldsmith, 5 Ves. 211, 213; Van Amringe v. Peabody, 1 Mason, 440; Petrie v. Clark, 11 Serg. & Rawle, 388; Paley on Agency, 330; Escot v. Milward, 7 Term Rep. 361 (b); Warner v. M'Coy, 1 Meeson & Welsby, 591; Baring v. Corrie, 2 Barn. & Ald. 137; Newson v. Thornton, 6 East, 17, 43; Parker v. Donaldson, 2 Watts & Serg. 21; 2 Smith's Leading Cases, 79, note; Graham v. Dyster, 6 Maule & Selw. 1, 4; Story on Agency, § 407 et seq.

3d. The causes and objects of the British statutes, and of the acts of our own legislatures, in respect to factors, will be found fully set forth and explained in the following-named works. Paley on Agency, by Lloyd, p. 222, &c., and Appendix, No. 1. &c.; Russell on Factors, &c., p. 122, &c.; Story on Agency, § 113, and note (5) thereto; in which note, however, the provision of the statute 6 Geo. 4, ch. 94, respecting pledges for preëxisting debts, is not stated with sufficient precision.

The act of New York upon this point was passed in 1830, and is contained in the third volume of Revised Laws, Appendix, p. 111.

The act of Pennsylvania upon this point was passed in 1834, and will be found in Purdon's Digest, p. 486 (ed. 1847).

Upon the construction of these acts, the following cases were cited. Russell on Factors, 132, &c.; Taylor v. Truman, 1 Mood. & Malk. 453; Taylor v. Kymer, 3 Barn. & Ad. 320; Fletcher v. Heath, 7 Barn. & Cres. 517, 524; Blandy v. Allen, 3 Car. & Payne, 447; Russell on Factors, 139, 145, 147; Evans v. Truman, 1 Mood. & Rob. 10; Stevens v. Wilson, 6 Hill, 512; Stevens v. Wilson, 3 Denio, 472; Pringle v. Phillips, 1 Sandf. Sup. Ct. 292; Hadwin v. Fisk, 1 La. Ann. Rep. 74.

Then as to Heald, Woodward, & Co. It was contended that they stand in no better situation than Warner, but in some respects are in a worse position.

1st. If Warner did not acquire a title to the tobacco of the complainant, he could not transfer a title to Heald, Woodward, & Co.

2d. Even if a purchaser bonâ fide, for a valuable consideration paid, would be protected, yet Heald, Woodward, & Co. were not such purchasers.

3d. Being at the time agents of the complainant, they were

disabled from purchasing, or in any way holding the property of their principal by an adverse title.

In reference to which points, the following authorities were cited. Story on Agency, p. 207, § 217, and the cases there stated; Bartholomew *v.* Leech, 7 Watts, 472, 474; Veil *v.* Mitchell, 4 Wash. C. C. 105, 106; Story on Agency, § 478.

Plea of purchase for a valuable consideration must aver actual payment before notice. It is not enough that the money was secured to be paid. Mitford's Pleadings, 338; Beames's Pleadings, 245, 246, 247; Story's Eq. Pleading, 464, 623, § 649, 810, &c.

Mr. Justice WAYNE delivered the opinion of the court.

We state such circumstances in this case as may be necessary for the application of our opinion to other cases of a like kind.

Martin & Franklin were manufacturers of tobacco in Richmond, Virginia. They were in the habit of shipping the article to Charles Esenwein in New York, as their agent and factor. In April, 1841, they made the first shipment upon a new account to Esenwein, and at intervals during the summer made other consignments to him. It was their practice to draw upon Esenwein, payable in four months, for an estimated portion of the proceeds of sale; among other drafts were the following: —

1841, May 27, at four months, due Sept. 30, for $ 800.
" June 12, " " " Oct. 15 " 700.
" July 3, " " " Nov. 6, " 300.
" July 29, " " " Dec. 2, " 850.

These drafts were not paid by Esenwein. The consignments during the period when the drafts were drawn were one hundred and sixty-two half, and one hundred and sixty whole boxes of tobacco. Esenwein's entry of the consignment is, " Statement of tobacco received by Charles Esenwein & Co. from Messrs. Martin & Franklin of Richmond, Virginia, to sell for their account."

The business relation between them in this transaction was that of principal and factor, unaffected by any particular instructions from the principals, or by any right or power acquired by the factor, beyond his general commission to sell the tobacco, according to the usages of trade in the place to which it had been sent for sale.

In August, 1841, Esenwein became embarrassed and sailed for Europe. He left his business under the management of his clerk, Engelbert Caprano. On the 3d of September Esen-

wein failed. Among his creditors was John A. Warner of Philadelphia. A short time before the failure, Mr. Warner, between whom and Esenwein there had been much previous dealing, went to New York. He then obtained from Caprano, the clerk, from the store of Esenwein, a quantity of tobacco, cigars, and other merchandise. The proof in the case is, that the tobacco was a part of the consignments which had been made within the dates before mentioned by Martin & Franklin to Esenwein. Warner says in his answer to the bill of the complainant, that the same was purchased by him for a full consideration and price, in like manner as he had frequently purchased from Esenwein; and that he did not know that the tobacco belonged to Martin & Franklin. But he admits, " the insolvency of Esenwein was believed." In his amended answer he says, he purchased the tobacco *bonâ fide*, in manner as had been before stated by him. That it was paid for after the purchase, by his paying and adjusting thirty thousand dollars of his own notes, which he had loaned to Esenwein, by his paying and redeeming them. Subsequently, in three days after Esenwein's failure, Heald, Woodward, & Co. of Philadelphia bought from Warner two hundred and fifty-eight boxes of tobacco, known as Martin's tobacco. The proof in the case is, that it was a part of that which Warner had obtained from Esenwein's clerk, which had been consigned to Esenwein by Martin & Franklin, as already stated. They aver, and there is no reason or cause to doubt it, that they purchased from Warner fairly, and for full value; that they had no knowledge whatever at the time, that the tobacco or any part of it belonged to the complainants; nor had they any reason to believe or know it. Their contract, however, with Warner, was rescinded in part. They received from him only one hundred and twenty-four boxes, instead of the two hundred and fifty-eight which had been sold to them.

From some other dealing between Heald, Woodward, & Co. and Martin & Franklin, the latter have drawn an inference of an agency of the former for them in this transaction. We think there was no such agency. At the same time we will say, that there was an unbecoming and apprehensive reserve in their reply to the letter of Martin & Franklin, making inquiries concerning their tobacco, which Warner had received from the clerk of Esenwein, a part of which Heald, Woodward, & Co. had bought from Warner and was then in their possession. It was, however, not a concealment, from which it can be inferred that Heald, Woodward, & Co. meant to commit either a legal or moral fraud upon their correspondent. It appears that they had nothing to do with the transfer of the

19*

tobacco to Warner, nor any other than a fair connection with him in the sale of it by Warner to them.

From this statement, we have no doubt of the law of the case. It may be applied, too, without any imputation upon the integrity of either of the parties concerned. The defendants have misapprehended the principles which govern the rights of themselves and the plaintiff; but there is nothing in their proceedings which impairs mercantile character. They have been much mistaken, without meaning premeditated unfairness. If some temper had not been thrown into the case at first, there probably would not have been any charge of fraudulent intention. No one will be surprised from the proceedings in the cause, and the argument made upon it in this court, that its merits were lost sight of, in the effort made on the one side to establish fraud, and on the other to resist it.

The exact questions raised by the record are, whether or not the transfer of the tobacco to Warner divested the plaintiff's ownership of it; and whether or not Warner's sale of a part of it to Heald, Woodward, & Co., for a full consideration, without any knowledge upon their part of the plaintiff's interest when they bought from Warner, gave to them a property in it.

Warner's account of dealings with Esenwein we believe to be true. In his answer, however, he puts his right to retain the tobacco upon a footing not applicable to it. He says he bought without knowing that Martin & Franklin had any interest in the tobacco, and that he believed Esenwein was the owner. His inference practically was, that he might therefore set off against the price his liability for the notes which he had lent to Esenwein as a debt due by Esenwein to him. This can only be done upon the principle that, where two persons equally innocent are prejudiced by the deceit of a third, the person who has put trust and confidence in the deceiver should be the loser. He discloses in his answer his knowledge of a fact which takes him out of any such relation to the plaintiff. It is his knowledge, at the time of the delivery of the tobacco to him, of the failure of Esenwein.

In all of those cases in which it has been ruled that the buyer who, at the time of the sale, knows nothing of the relation between the factor with whom he deals and the principal by whom that factor has been employed, is protected by the law, in case of a misadventure occurring by the default of the factor, it is admitted that the risk which a principal runs, through the inadvertence or misconduct of his agent, may be avoided, by the purchaser having notice, at any time before the completion of the purchase or delivery of the goods, of the

agent's commission. Peake, 177. Among the instances which the law terms notice enough for such a purpose is the insolvency of the factor known to the buyer. Eastcott *v.* Milward, 7 Term Rep. 361; Ibid. 366. Warner says in his answer, that, at the time he made his purchase, "the insolvency of Esenwein was believed." Those are his words, and according to all that class of cases asserting the principle under which his answer puts him, such knowledge was sufficient to entitle the plaintiff to avoid the sale.

Again, a transfer to him, by way of sale, by the clerk of Esenwein, of property trusted to the latter as a factor, could not pass the title or right in it from the real owner.

It made no difference, that Caprano had been left to transact Esenwein's business whilst he was in Europe. A factor cannot delegate his trust to his clerk. The law upon this point is well settled. It has been repeatedly ruled. The first example in the first paragraph of Paley on Agency, upon the "execution of authority," is, if an agent be appointed to sell, he cannot depute the power to a clerk or under agent, notwithstanding any usage of trade, unless by express assent of the principal.

The utmost relaxation of the rule, *Potestas delegata non potest delegare,* in respect to mercantile persons, is, that a consignee or agent for the sale of merchandise may employ a broker for the purpose, when such is the usual course of business. Trueman *v.* Loder, 11 Adolph. & Ell. 589. Or where the usual course of the management of the principal's concerns in the employment of a sub-agent has been pursued for a length of time, and been recognized by the owners of property, they will be taken to have adopted the acts of the sub-agent as the acts of the agent himself. Blore *v.* Sutton, 3 Meriv. 237; Combes's case, 9 Co. 75–77; Roll. Abr. 330; Palliser *v.* Ord, Bunb. 166. Lord Eldon, in Coles *v.* Trecothick, 9 Ves. jr. 236, reprobates the notion, that, if an auctioneer is authorized to sell, all his clerks are, during his absence, in consequence of any such usage in that business. It was ruled by the Master of the Rolls in Blore *v.* Sutton, 3 Meriv. 237, that an agreement for a lease, evidenced only by a memorandum in writing, entered in the book of an authorized agent, signed by his clerk and not by the agent himself, was not a sufficient agreement in writing, it not being signed by an agent properly authorized, notwithstanding the entry was shown in evidence to have been approved by, and that it was made under the immediate direction of, the authorized agent, and in the usual course of the business of his office. A factor cannot delegate his employment to another, so as to raise a privity between that other and his principal. Solly *v.* Rathbone, 2 Maule & Selw. 299; Cock-

ran v. Irlam, Ibid. 301. The reason of the rule in all these mercantile agencies is, that it is a trust and confidence reposed in the ability and integrity of the person authorized. An agent ordinarily, and without express authority, or a fair presumption of one, growing out of the particular transaction or the usage of trade, has not the power to employ a sub-agent to do the business, without the knowledge or consent of his principal. The agency is a personal trust for a ministerial purpose, and cannot be delegated; for the principal employs the agent from the opinion he has of his personal skill and integrity, and the latter has no right to turn his principal over to another, of whom he knows nothing. 2 Kent's Comm. 633. No usage of trade anywhere permits a factor to delegate to his clerk the commission trusted to himself. In this case, there was a transfer of the plaintiffs' property to Warner, by a clerk of their factor. He knew when it was done that he was giving their property to a creditor of his employer in payment of his debt; and both himself and the purchaser knew that Esenwein was in failing circumstances, or, as Warner expresses it, " that his insolvency was believed." It must be admitted that such a transfer passed no property in the thing transferred, and that it may be reclaimed by the owner, as well from any person to whom it has been sold by the first buyer as from himself. It is the case of property tortiously taken from the owner or his agent, without any fault of the owner, and as such cannot take away his right to it.

On either of the grounds already mentioned, the plaintiff would be entitled to recover from the defendants in this case. But there is a third, which shall be stated in connection with other points respecting principals and factors, which it will not be out of place to notice. A factor or agent who has power to sell the produce of his principal has no power to affect the property by tortiously pledging it as a security or satisfaction for a debt of his own, and it is of no consequence that the pledgee is ignorant of the factor's not being the owner. Paterson v. Tash, Str. 1178; Maans v. Henderson, 1 East, 337; Newson v. Thornton, 6 East, 17; 2 Smith, 207; McCombie v. Davies, 6 East, 538; 7 East, 5; Daubigny v. Duval, 5 T. R. 604; 1 Maule & Selw. 140, 147; 2 Stark. 539; Guichard v. Morgan, 4 Moore, 36; 2 Brod. & Bingh. 639; 2 Ves. jr. 213. When goods are so pledged or disposed of, the principal may recover them back by an action of trover against the pawnee, without tendering to the factor what may be due to him, and without any tender to the pawnee of the sum for which the goods were pledged (Daubigney v. Duval, 5 T. R. 604); or without any demand of such goods (6 East, 538; 12 Mod.

514); and it is no excuse that the pawnee was wholly ignorant that he who held the goods held them as a mere agent or factor (Martini *v.* Coles, 1 Maule & Selw. 140), unless, indeed, where the principal has held forth the agent as the principal (6 Maule & Selw. 147). But a factor who has a lien on the goods of his principal may deliver them over to a third person, as a security to the extent of his lien, and may appoint such person to keep possession of the goods for him. In that case, the principal must tender the amount of the lien due to the factor, before he can be entitled to recover back the goods so pledged. Hartop *v.* Hoare, Str. 1187; Daubigny *v.* Duval, 5 T. R. 604; 6 East, 538; 7 East, 5; 3 Chitty's Com. Law, 193. So a sale upon credit, instead of being for ready money, under a general authority to sell, and in a trade where the usage is to sell for ready money only, creates no contract between the owner and the buyer, and the thing sold may be recovered in an action of trover. Paley, Principal and Agent, 109; 12 Mod. 514. Under any of these irregular transfers, courts of equity (as is now being done in this case) will compel the holder to give an account of the property he holds.

But it was said, though a factor may not pledge the merchandise of his principal as a security for his debt, he may sell to his creditor in payment of an antecedent debt. No case can be found affirming such a doctrine. It is a misconception, arising from the misapplication of correct principles to a case not belonging to any one of them. The power of the factor to make such a sale, and the right of the creditor to retain the property, has been erroneously put upon its being the usual course of business between factors to make a set-off of balances as they may exist in favor of one or the other of them against the price of subsequent purchases in their dealings. The difference between such a practice and a sale for an antecedent debt must be obvious to every one when it is stated. In the one, the mutual dealing between mercantile persons who buy and sell on their own account, and who also sell upon commission for others, is according to the well-known usage of trade. Its convenience requires that such a practice shall be permitted. But it must be remembered it is an allowance for the convenience of trade, and for a readier settlement of accounts between factors for their purchases from each other in that character. It does not, however, in any instance, bind a principal in the transfer of merchandise, if there has been a departure from the usages of trade, or a violation of any principle regulating the obligations and rights of principal and factor.

Again, it has been supposed that the right of a factor to sell the merchandise of his principal to his own creditor, in payment

of an antecedent debt, finds its sanction in the fact of the credi-tor's belief that his debtor is the owner of the merchandise, and his ignorance that it belongs to another; and if in the last he has been deceived, that the person by whom the delinquent fac-tor has been trusted shall be the loser. The principle does not cover the case. When a contract is proposed between factors, or between a factor and any other creditor, to pass property for an antecedent debt, it is not a sale in the legal sense of that word or in any sense in which it is used in reference to the commission which a factor has to sell. See Berry *v.* Williamson, 8 Howard, 495. It is not according to the usage of trade. It is a naked transfer of property in payment of a debt. Money, it is true, is the consideration of such a transfer, but no money passes between the contracting parties. The creditor pays none, and when the debtor has given to him the property of another in release of his obligation, their relation has only been changed by his violation of an agency which society in its business relations cannot do without, which every man has a right to use, and which every person undertaking it promises to discharge with unbroken fidelity. When such a transfer of property is made by a factor for his debt, it is a departure from the usage of trade, known as well by the creditor as it is by the factor. It is more; it is the violation of all that a factor con-tracts to do with the property of his principal. It has been given to him to sell. He may sell for cash, or he may do so upon credit, as may be the usage of trade. A transfer for an antecedent, debt is not doing one thing or the other. Both creditor and debtor know it to be neither. That their dealing for such a purpose will be a transaction out of the usage of the business of a factor. It does not matter that the creditor may not know, when he takes the property, that the factor's principal owns it; that he believed it to be the factor's in good faith. His dealing with his debtor is an attempt between them to have the latter's debt paid by the accord and satisfaction of the com-mon law. That is, when, instead of a sale for a price, a thing is given by the debtor to the creditor in payment, in which we all know that, if the thing given is the property of another, there will be no satisfaction. It is the *dation en payement* of the civil law as it prevails in Louisiana, which is, when a debtor gives, and the creditor receives, instead of money, a movable or immovable thing in satisfaction of the debt.

Courts of law and courts of equity, in a proper case before either, will look at such a transaction as one in which both principal and creditor have been deceived by the factor, so far as the deceit is concerned; but it will also be remembered in favor of the principal, that the creditor has acquired the prin-

cipal's property from his factor, with the creditor's knowledge, out of the usual course of trade, and will reinstate him in his former relation to his debtor, rather than that the creditor should be permitted to keep the property of another, who is altogether without fault, in payment of his debt. 'As to a factor's power to bind his principal by a disposition of his goods, the common law rule is, " that, to acquire a good title to the employer's property by purchasing it from his agent, such purchase must have been, either in market overt and without knowledge of the seller's representative capacity, or from an agent acting according to his instructions, or from one acting in the usual course of his employment, and whom the buyer did not know to be transgressing his instructions," or that he had not such notice as the law deems equivalent to raise that presumption. " The reason of this is clear, for unless the transaction took place *bonâ fide* in a market overt, (in which case a peculiar rule of law in England steps in for its protection,) an agent selling without express authority must, that his acts may be supported, have sold under an implied one. But an implied one thereby always empowers the person authorized to act in the usual course of his employment; consequently, if he sells in an unusual mode, he could have no implied authority to support his act, and, as he had no express one, his sale of course falls to the ground." Smith's Mercantile Law, 111, 112.

The defendants are not within the compendious summary just stated. There has been a transfer of property, which was consigned to a factor for sale, by his clerk, to a creditor of his employer, who knew his debtor to be in failing circumstances, just as well as the clerk himself did; and of property, too, which the clerk knew to be the property of the plaintiff, and which the creditor bargained for knowingly out of the usual course of trade. Nor should we omit to say, that Esenwein's opinion and disapproval of what had been done by his clerk with his principal's tobacco are significantly disclosed by the fact, that, upon his return from Europe, he redeemed so much of it as had been assigned to Mr. Conolly by his clerk in payment of a debt, and sold and remitted the proceeds to his principals.

By the common law, the transfer of the plaintiff's tobacco to Warner cannot be maintained. He is responsible to them for the value of so much of it as was not transferred by him to Heald, Woodward, & Co. Heald, Woodward, & Co. are responsible for so much of it as Warner transferred to them, because Warner, having no property in it, could not convey any to them. But Warner is answerable to them for that amount, and he is replaced for the whole as a creditor of Esenwein, just as he was before the transaction occurred.

The application of these principles of the common law to these parties, if it needed confirmation, would receive it from the statute of New York of April, 1830, for the amendment of the law relative to principals and factors or agents. The transfer to Warner was a New York transaction. The third section of that act very distinctly provides for those cases when the ownership, by the factor, of goods which he contracts to sell, shall be said to exist, to give protection to purchasers against any claim of the factor's principal. It is when he contracts for any money advanced, or for any negotiable instrument or other obligation in writing given for merchandise, upon the faith that the factor is the owner of it. The concluding words of the section are, " given by such other person upon the faith thereof." Three misconstructions of that act have been prevalent, but they have been corrected by the courts of New York. We concur with them fully. One was, that the statute altered the common law, so as to give validity to a sale made by the factor for an antecedent debt due by him to the person with whom he contracts; another, that the statute gave to a purchaser protection, whether he knew or not that the goods which the factor contracted to sell him were not the factor's, and belonged to his principal; and the other, that the concluding words, " upon the faith thereof," related to the advance made upon the goods, and not to the property which the factor had in them. Similar misconceptions were prevalent, and perhaps still prevail, concerning the corresponding section in the English factor's act, Geo. 4, ch. 94, 1825. The alterations of the common law, in this particular, by the English and the New York statutes, were suggested by practical and experienced merchants in both countries, to meet the exigencies of internal trade and its extension between nations. They are believed by their operation to be improvements in the law merchant. It may be owing to a misapprehension of those acts, that the defendants denied to the plaintiffs their rights. Fortunately the law secures them, and the case settled now as it is may prevent other controversies like it.

We shall direct the decree of the Circuit Court to be affirmed; and also order a decree to be entered against the defendants, that each of them shall pay to the plaintiffs the value of the tobacco which the defendants respectively retained, with interest upon the same as from the dates of the transfers of it to them.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern

District of Pennsylvania, and was argued by counsel. On consideration whereof, it is the opinion of this court, that there is no error in the decree of the said Circuit Court, " that the defendants do pay to the complainants the sum of $2,869.14, with interest from the 25th of September, 1848," and that the same should be affirmed, with costs; and that the complainants are entitled to recover from Warner & Co. $1,376.92$\frac{1}{3}$ (part of the aforesaid sum of $2,869.14) with interest thereon from the 25th of September, 1848, together with $      on account of the costs of the complainants in this court, and to have execution against them for the said several sums, amounting to $      ; and also that the said complainants are entitled to recover from the said Heald, Woodward, & Co. $1,492.21$\frac{2}{3}$ (the residue of the said sum of $2,869.14) with interest thereon from the 25th of September, 1848, together with $      in full of the balance of the costs of the complainants in this court, and to have execution against them for the said several sums, amounting to $      Whereupon it is now here ordered, adjudged, and decreed by this court, that this cause be, and the same is hereby, remanded to the said Circuit Court, with directions to enter a decree in conformity to the opinion of this court, and to proceed therein accordingly.