MILLER VS SPRINGFIELD WAGON CO.

Opinion delivered October 27, 1905.

(89 S. W. Rep. 1011).

1. *Trial—Order of Proof.*

Under the express provisions of Mansf. Dig. § 2897(Ind. Ter. Ann. St. 1899, § 2012), the party who begins a case must ordinarily exhaust his evidence before the other begins; but the order of proof is to be regulated by the court so as to expedite the trial.

(Ed. Note.—For cases in point, see vol., 46 Cent. Dig. Trial §§ 138-139-156).

2. *Principal and Agent—Sale by Agent—Individual Transaction— Remedy of Principal.*

Where one, having wagons to sell for his principal, conveyed one in cancellation of his individual indebtedness to one who knew the

facts in regard to the agency, the principal was entitled to recover the price from the purchaser.

Appeal from the United States Court for the Northern District of the Indian Territory; before Justice Joseph A. Gill, April 14, 1904.

Action by the Springfield Wagon Company against W. W. Miller. From a judgment in favor of plaintiff, defendant appeals. Affirmed.

This action was instituted before a United States commissioner for the Northern District of Indian Territory by plaintiff (appellee) filing an affidavit for vendor's lien on June 10, 1903. Summons issued and served. Controverting affidavit filed by defendant (appellant), case tried before commissioner, and appealed to the District Court for the Northern District sitting at Claremore, I. T. The only pleadings in the cause are the affidavits by the plaintiff and defendant. Plaintiff in its affidavit alleges that it is a corporation under the laws of the state of Missouri and doing business in the Indian Territory, and for cause of action states that on November 10, 1902, it sold to defendant one Springfield work wagon, with bows, for $72.75, payable at that time; that defendant took and now has possession of same, and that no part of the purchase money has been paid; that the same is due and owing to plaintiff, and plaintiff has a vendor's lien on said wagon for said purchase money; that plaintiff asks for attachment of said wagon and judgment for $72.75 and costs; that said wagon be sold to pay judgment, and, if judgment not satisfied from proceeds of sale, that it have judgment against defendant for balance of same. Defendant in his affidavit, for answer, says that he does not know that plaintiff is a corporation and doing business as alleged, and denies specifically the other allegations

of plaintiff, and alleges that in the fall of 1902 he purchased from Joseph Hunt & Co., of Vinita, I. T., one Springfield wagon and fixtures for $72.35; that the same was delivered to him in part payment of two certain farms and improvements in the Cherokee Nation, Indian Territory; that said Hunt & Co. is composed of Joseph Hunt and Charles J. Hunt; that he purchased the wagon outright from said Hunt & Co., and delivered them the possession of the places sold to them; that on December 24, 1902, Hunt & Co. sent defendant a statement of his account, which Hunt & Co. claimed was due them; that they had the item of one wagon set out in this statement, which defendant purchased from Hunt & Co., and is the only Springfield wagon he has, and asks to be dismissed, with his costs. The case was tried in the District Court on April 13, 1904, and at the conclusion of the testimony the court directed a verdict for the plaintiff, to which action of the court defendant excepted and appealed to this court.

*J. S. Davenport*, for appellant.

*Geo. E. McCulloch*, for appellee.

TOWNSEND, J. (after stating the facts). The appellant has filed five assignments of error. The first specification is the alleged error of the court in sustaining objections of appellee to the admission of certain questions propounded to plaintiff's witness, Hunt, on cross-examination. The second specification is the alleged error of the court in sustaining the objection of appellee to questions propounded to defendant on his direct examination. The third specification is the alleged error of the court in directing a verdict for appellee. The fourth specification is the alleged error of the court in receiving and recording the verdict, and the fifth specification is the alleged error of the court in overruling appellant's motion for new trial.

The first specification of error assigned was the action of the court in sustaining the objections of appellee to the two questions, as follows: "By Mr. Davenport: Q. One of the places were delivered? (To this last question asked witness counsel for plaintiff objects, for the reason that same is irrelevant and not proper cross-examination. By the Court: Not proper cross-examination. The objection is sustained. To which ruling of court counsel for defendant, at the time, duly excepted and still excepts). Q. I will ask you if Joseph Hunt & Co. did not on the 24th day of December, 1902, send to W. W. Miller, of the city of Vinita, a statement of his account between Joseph Hunt & Co. and W. W. Miller? (To this last question asked witness counsel for plaintiff objects, for the reason that same is not proper cross-examination. By the court: Read the question (which is here done). By the Court: Objection sustained. To which ruling of court counsel for defendant, at the time, duly excepted and still excepts)." It thus appears that the objections were sustained to the questions about the delivery of the place and the furnishing of the statement of the account, on the ground that they were not cross-examination; the witness not having been asked on direct examination anything concerning these matters. It is provided in Mansf. Dig. § 2897 (Ind. Ter. Ann. St. 1899, § 2012) as follows: "The party who begins the case must ordinarily exhaust his evidence before the other begins. But the order of proof shall be regulated by the court, so as to expedite the trial and enable the tribunal to obtain a clear view of the whole evidence."

The court is therefore expressly authorized to regulate the order of proof, and it appears that the appellant, on his direct examination, was permitted to testify to the questions to which objection had been sustained, without objection, as follows: "Q. Did you have any dealings with Joseph Hunt

and his son during the year 1902? A. Yes, sir. Q. What was those dealings? A. I traded Mr. Hunt and his son two improvements, east of Vinita, and in the consideration I was to take one Springfield wagon and one surrey. Q. Well, what was done with reference to delivering the places, if anything, by you? A. I delivered one of the places and the other I was to deliver the 1st of January, and they were to deliver to me a surrey at once. The wagon I was to get some time during the summer or fall, whenever I went after it. They never did deliver the surrey. Q. What, if anything, was paid on the places that you received? A. The first thing I got was the wagon. Q. Do you remember to — (By Mr. McCulloch: I object to that question, and ask that it be stricken, which objection and motion of the plaintiff is by the court overruled, to which ruling of court counsel for plaintiff, at the time, duly excepted and still excepts). Q. Do you remember about the date you got the wagon, Mr. Miller? A. No, sir. Some time after the 1st of November. Q. Well, now, you turned over one of the places to them? A. Yes, sir. Q. What place? A. The one the old gentleman was to get. Q. What, if anything, in the way of the use of the place? How long was they to keep it, Mr. Miller? (To this last question asked witness counsel for plaintiff objects, for the reason that same is incompetent, irrelevant, and immaterial, and for the further reason that it does not tend to prove an issue in the case. By the Court: It don't make any difference how long they kept it, if it was turned over to them. To which ruling of the court counsel for defendant, at the time, duly excepted and still excepts). Q. I will ask you if you had any dealings with Joseph Hunt & Co. as the agent of the Springfield Wagon Company? (By the Court: Just wait a minute. Q. Did you turn the places over to them absolutely on the trade? A. Yes, sir. By the Court: They weren't to hold it and take rents? A. They were to hold the places

that I turned over and collect rents—the hay land. By the Court: Q. And they have turned it back to you? A. No, sir; kept it. That was the old gentleman. By the Court: All right. Objection sustained. To which ruling of the court counsel for defendant, at the time, duly excepted and still excepts). Q. Did you have any dealings with them as the agent of the Springfield Wagon Company whatever with reference to buying a wagon? A. Never did. Didn't know the Springfield Wagon Company. (To this last question asked witness counsel for plaintiff objects, for the reason that same is incompetent, irrelevant, and immaterial. Which objection is by the court overruled, to which ruling of the court counsel for plaintiff, at the time, duly excepted and still excepts). Q. Did you have any conversation with Mr. Hunt—Mr. Joseph Hunt—at the time you traded, or the trade was on, with reference to a wagon that would be furnished you? A. Yes, sir. Q. I wish you would state what that was. A. Mr. Hunt asked me, if I didn't want the wagon, to leave it there as long as I could. Whenever I got the wagon, they would have to pay for it; have to settle with the Springfield Wagon Company; and they furnished me a wagon a few days to haul off my wheat rather than to let me take the wagon out of the house for thirty or sixty days, whenever I would need it. They furnished me a wagon. Q. What, if anything, was agreed between you and Mr. Hunt, who has just testified, as to you signing your note to the Springfield Wagon Company for the wagon you received? A. Never was anything said about a note. Q. Was there anything of a trade, one way or other, by which you agreed that you would sign a note to the Springfield Wagon Company? A. Never was. Q. Did you, about the date you received the wagon, receive from Joseph Hunt & Co. a statement of what purported to be your account between you and Joseph Hunt & Co.? A. Yes, sir. Q. I will ask you whether—I will ask you to examine

the paper which is marked Exhibit 1 and state whether or not that is the statement that was furnished you by Joseph Hunt & Co., of your account, between Joseph Hunt & Co. and yourself? A. Yes, sir; that is the statement. Q. I will ask you if that statement shows you to be charged with Joseph Hunt & Co. for a wagon? A. Yes, sir; and $8.00 for the hay cut off that land. Mr. Davenport: We desire now to offer this statement. By Mr. McCulloch: We have no objections to offer."

It is shown by this examination of appellant that he was allowed to testify without objection about the delivery of one of the places to Joseph Hunt, and also to testify about the statement of the account, and, while the appellant testifies that he didn't know the Springfield Wagon Company, yet he testifies: "A. Mr. Hunt asked me, if I didn't want the wagon, to leave it there as long as I could. Whenever I got the wagon, they would have to pay for it; have to settle with the Springfield Wagon Company; and they furnished me a wagon a few days to haul off my wheat rather than to let me take the wagon out of the house for thirty or sixty days, whenever I would need it. They furnished me a wagon." And further testifies on cross-examination as follows: "Q. You knew at the time that Joseph Hunt & Co. were the agents of the Springfield Wagon Company? A. Yes, sir. Q. You knew that? A. Yes, sir. Q. You stated that Mr. Hunt told you, as soon as the wagon went out, that they would have to settle for it? A. Yes, sir. Q. That they would be responsible for it? A. Yes, sir. Q. Then you knew that this was one of the Springfield Wagon Company's wagons? A. Yes, sir; but I handled wagons enough to know the conditions of the contracts—what they were. Q. You have never paid for this wagon, have you? A. Yes, sir. Q. You never paid the Springfield Wagon Company for it? A. No, sir. Q. You never paid

Joseph Hunt & Co. any money for this wagon? A. No, sir; I paid mighty dear, however. Q. You did have a trade with Joseph Hunt & Co., by which they wanted to put these wagons in on that deal? A. Yes, sir. Q. You say that? You don't know whether they ever paid for the wagon or not, do you? A. That wasn't none of my business. Q. You don't know? A. No, sir. Q. You don't know whether it has been paid for or not? A. No, sir. Q. You got the wagon? A. Yes, sir."

It is thus shown that appellant knew that Hunt & Co. were the agents of the plaintiff, and that the wagon he purchased was one of the Springfield Wagon Company's wagons, and that he knew what the conditions of the contracts were, and that he had never paid the plaintiff for the wagon. The witness Hunt testified that appellant was to sign a note for the wagon, and that he prepared one for appellant to sign, but that, in his absence, appellant obtained possession of the wagon, and then refused to sign the note. Appellant denies this. Appellant contends that he had sold and delivered to Hunt & Co. the possession of certain farms, and that this wagon was in part payment of the same. There certainly was no authority given by appellee to its agents, Hunt & Co., in the agreement appointing Hunt & Co. agents for plaintiff, to convey any of its wagons in payment of their individual indebtedness. Appellant says he knows the conditions of the contracts, and, when he deals with an agent about the property of the principal, he is presumed to know the extent of the agent's authority. In Mechem on Agency, it is said: "Sec. 344. For reasons similar to those preventing payment to an agent authorized merely to sell, the purchaser cannot set off against the principal a debt due him from the agent."

"Sec. 354. No Authority to Appropriate to His Own Use. An agent entrusted with goods to sell for his principal

has no right to sell or deliver them in payment of his own debt, or to pledge them as security for his own debt, and persons dealing with such an agent are bound to take notice of this limitation of his authority. .A creditor, therefore, who receives the goods under such an arrangement, as well as his vendee, though acting in good faith and in ignorance that the goods did not belong to the agent, acquires no title thereto as against the principal. Warner vs Martin, 11 How. (U. S.) 209, 13 L. Ed. 667; Belton Compress Co. vs Belton Brick Mfg. Co., 64 Tex. 337; De Bouchout vs Goldsmid, 5 Ves. Jun. 211, and cases above cited. An agent cannot bind his principal by an agreement to pay his own private debts out of his principal's property. Rice vs Lyndeborough Glass Co., 60 N. H. 195."

"Sec. 461. Agent Authorized to Sell may Not Become the Purchaser. For the same reasons, an agent authorized to sell or let his principal's property cannot, without the latter's consent, become the purchaser or lessee. If he does so, the principal may repudiate it and recover back his property. Here, too, as in the preceding cases, the law looks at the natural and legitimate tendency of such transactions, and not at the motive of the agent in any given case. This tendency is demoralizing, and the fact that in a certain case the agent's motive was honorable, or that the result is more beneficial to the principal, will make no difference if the latter chooses to repudiate it. Said a learned judge: 'If such contracts were to be held valid until shown to be fraudulent or corrupt, the result, as a general rule, would be that they must be enforced in spite of fraud or corruption. Hence the only safe rule in such cases is to treat the contract as void, without reference to the question of fraud in fact, unless affirmed by the opposite party. This rule appears to me so manifestly in accordance with sound public policy as to require no authority for its support.' "

See, also, Rinehardt on Agency, § 378, and Mechem on Sales, vol. 1, § 175, as follows: "The authority to sell may, of course, be conferred expressly and under a great variety of circumstances, to which it is not necessary here to refer. It may have been previously given or result from a subsequent ratification by the principal with full knowledge of the material facts; such a ratification being, in general, the equivalent of a prior authorization. Such an authority is to be exercised for the benefit of the principal, and not, under any circumstances, for the personal benefit of the agent. He will not be permitted, without the full knowledge and consent of his principal, to sell to himself, either directly or indirectly, or otherwise deal with himself on his principal's account."

In Smith vs James, 53 Ark. 135, 13 S. W. 701, it is expressly decided that an agent cannot accept a cancellation of his own debt in payment of his principal's goods.

We are of the opinion that the law, as applied to the facts disclosed by this record, fully justified the court below in directing a verdict for the plaintiff in this case, and hence the judgment of the court below is affirmed.

CLAYTON, J., concurs. RAYMOND, C. J., not participating.