MOORE *et al. v.* HILL *et al.*

(*Circuit Court, W. D Tennessee.* January 5, 1889.)

1. SHIPPING—THE MASTER—SALE OF DAMAGED CARGO.

The master of a vessel has no power after arrival at the port of destination to sell that part of the cargo which has been damaged by fire while under way, and a factor who sells, as his agent, while ignorant of the wrong-doing, and applies the proceeds to the payment of advances made to the master, is liable to the consignor for a conversion of the goods to his own use. *Per* JACKSON, J. HAMMOND, J. *per contra.*

2. FACTORS AND BROKERS—SALE OF GOODS FRAUDULENTLY OBTAINED—CON-
VERSION.

If one having the custody of goods for carriage fraudulently appropriate
them to his own use by consigning them in his own name for sale to a factor
who makes advances upon them, the factor is liable for conversion to the
rightful owner if he sell them and retain the advances out of the proceeds,
although he be entirely ignorant of any want of title in his customer, and
wholly innocent of any wrongful intention on his part. *Per* JACKSON, J.
HAMMOND, J., *per contra.*

3. SAME.

Cotton shipped by a vessel for transportation partly by river and partly by
rail, was burned *en route* on the river, so that it became an indistinguishable
mass, as between its owners and shippers. The master, on arriving at the
destination of the vessel, consigned the burnt cotton in his own name, with-
out disclosing the facts, and acting as if he were the owner, to a factor for
sale, drawing drafts against it which were paid by the factor as advances on
the bill of lading, in the innocent belief that his customer was the rightful
owner. After the cotton was sold, and the proceeds collected by the factor,
but before the credits were actually entered on the books, the rightful owner
gave notice that he owned a proportional part of it, and demanded the pro-
ceeds, which being refused, he brought this suit for conversion. *Held, per*
JACKSON, J., that the factor was liable, and *per* HAMMOND, J., that he was not.[1]

At Law.
*Metcalf & Walker*, for plaintiffs.
*Hill & Wilkerson*, for defendants.
Before JACKSON and HAMMOND, JJ.

JACKSON, J.   This suit is brought to recover the proceeds of a certain
lot of cotton as the property of the plaintiffs, which it is claimed was
wrongfully converted by defendants to their own use.   There is no con-
troversy or dispute as to the material facts of the case, which are the fol-
lowing:   In December, 1885, the plaintiffs were the consignees and own-
ers of 79 bales of cotton, which were shipped to them from points on
the Tennessee river near Huntsville, Ala., by the steam-boat Myra, to
be carried to Chattanooga,, and from there reshipped by way of the Cin-
cinnati Southern Railroad to the plaintiffs at Cincinnati, where they re-
sided and did business.   There was also upon the steam-boat on this
trip another small lot of cotton (about 18 bales) in addition to that be-
longing to plaintiffs.   Before the Myra reached Chattanooga, her port
of destination, so far as plaintiffs' cotton was concerned, a fire occurred
on the boat, which damaged a portion of her cotton cargo, by burning off
the bagging, obliterating the marks, and scorching the cotton in such a
way as to render it difficult, if not impossible, to separate or distinguish
such damaged portion as between the plaintiffs and the owners or con-
signees of the small lot.   On the arrival of the Myra at Chattanooga,

A factor with whom cotton is stored for sale, may, by custom, make advances on
it, and thereby acquire a lien which is subordinate only to outstanding legal rights, or
to paramount equities of which he has notice. Barnett v. Warren, (Ala.) 2 South. Rep.
457. Cotton factors who exercise unauthorized control over, and make an unauthorized
disposition of, cotton consigned to them, become liable in trover for its conversion. Gal-
breath v. Epperson, (Tenn.) 1 S. W. Rep. 157. Factors who receive and pay for stolen
cattle, not knowing that they are stolen, and afterwards sell them, are liable to the
purchaser for their price, on their being reclaimed by the true owner. Edgerton v
Michels, (Wis.) 26 N. W. Rep. 748.

only 45 of the 79 bales consigned to plaintiffs could be clearly identified. These 45 bales were, by warehousemen at Chattanooga, duly forwarded to and received by plaintiffs. The cotton damaged by fire and water, embracing 34 bales of plaintiffs' cotton, and 18 bales belonging to other parties, was first stored in a common mass in a warehouse at Chattanooga, and was shortly afterwards shipped by G. A. Samuels, the master of the Myra, to the defendants, Hill, Fontaine & Co., cotton factors and commission merchants at Memphis, Tenn., to whom said Samuels ordered the railroad bills of lading for said 52 damaged bales. On the arrival of the boat at Chattanooga no notice was given plaintiffs of the fact that 34 bales of their cotton were damaged, and its marks obliterated; nor were they informed of the fact that it had been stored in a warehouse at Chattanooga; nor were they asked to give instructions in reference to its disposition. They had no knowledge or information that said Samuels would or had shipped the cotton to the defendants, and never consented to his so doing. In making this shipment of said 52 damaged bales of cotton to the defendants, Samuels took the bills of lading therefor in his own name, and in forwarding to defendants the bills of lading for the same, with his blank indorsement thereon, he did not disclose to them the facts in connection with the cotton. He made the consignment to defendants not as master of the Myra, or in any agency capacity, but in his own name, as the owner of the cotton. The defendants were entirely ignorant of the plaintiffs' interest in the cotton, nor was there anything in connection with the shipment to lead them to doubt or suspect that Samuels was not the owner, as he assumed to be in making the consignment. In a letter inclosing the bills of lading, and advising the defendants of the shipment, Samuels notified them that he had drawn certain drafts on them to the amount of $1,348.51. He, however, between the 5th and 10th of December, 1885, drew drafts on defendants to the amount of $1,448.51, which were duly honored and paid by them on and between said dates. The cotton was received by defendants at Memphis on or about December 12, 1885. In order to put the cotton in condition for sale, it had to be repacked, and in the repacking it made or turned out only 48 bales, which the defendants thereafter sold for account of said Samuels, with whom defendants opened an account current on their books, in which account they charged said Samuels with the amount of his several drafts as paid, together with the balance of interest against him, amounting December 7, 1886, to $10.20, and credited him with the net proceeds arising from the sales of the cotton. The net proceeds thus realized from the cotton by the defendants, with the dates of sales and the dates of credits given Samuels therefor, as appears from a statement furnished by defendants, were the following, viz.: December 31, 1885, 3 bales cotton sold, net proceeds, $93.24, credited to Samuels January 18, 1886; December 31, 1885, 4 bales cotton sold, net proceeds, $121.22, credited to Samuels January 13, 1886; January 2, 1886, 14 bales cotton sold, net proceeds, $439.76, credited to Samuels January 14, 1886, January 4, 1886, 4 bales cotton sold, net proceeds, $115.99, credited to Samuels January 15, 1886; January 4, 1886, 3 bales cotton sold,

net proceeds, $108.29, credited to Samuels January 16, 1886; January 13, 1886, 15 bales cotton sold, net proceeds, $429.59, credited to Samuels January 22, 1886; January 14, 1886, 1 bale cotton sold, net proceeds, $35.14, credited to Samuels January 26, 1886; January 15, 1886, 3 bales cotton sold, net proceeds, $85.24, credited to Samuels January 25, 1886; March 6, 1886, 1 bale cotton sold, net proceeds, $26.60, credited to Samuels March 6, 1886. The plaintiffs, under date of January 13, 1886, wrote the defendants as follows:

"*Messrs. Hill, Fontaine & Co. Memphis, Tenn.*—DEAR SIRS: We learn that 34 bales of cotton shipped to us on the steam-boat Myra, and which were damaged by fire and water, have been sent to you, and are now in your possession. We beg that you will take notice that we hold B. L. for this 34 bales, and that the cotton was wrongfully diverted without our consent or knowledge; and that we shall hold you accountable for the same."

This letter, as stated by one of the defendants, Mr. Fontaine, was received on the 14th of January, 1886. The defendants failed to reply thereto, and it was followed, early in February, 1886, by a formal demand upon them for the cotton or its proceeds. The defendants declined to recognize the plaintiffs' right to the cotton or its proceeds, on the ground that they had made advances to Samuels in the *bona fide* belief that he was the owner of the cotton, and on the credit of the bills of lading which he indorsed to them, and of the cotton which he consigned to them; that these advances to Samuels having been made by them upon the security of the cotton so placed in their hands, and before they had any notice or knowledge of plaintiffs' rights in or to the cotton, they had the right to retain it as against the plaintiffs, and apply the proceeds thereof to reimburse themselves for the advances so made said Samuels. It appears from the foregoing statement that up to January 14, 1886, when defendants received plaintiffs' letter notifying them of their claim to the cotton, only $121.22 (being proceeds of 4 bales cotton sold December 31, 1885) had been actually credited by defendants to said Samuels. The other credits were given said Samuels on and after the 14th of January, 1886. It admits of no question, under the evidence, that plaintiffs' 34 bales of damaged cotton went into the defendants' hands in the mingled lot of 52 bales shipped to them by Samuels, which, upon the repacking, made the 48 bales, which defendants sold, and applied the proceeds thereof as above stated; and the plaintiffs therefore claim of the defendants such proportion of the entire proceeds as the quantity of cotton belonging to them bore to the whole. In other words, they claim 34-52 of the whole proceeds, being $951.35, with interest.

Under the foregoing statement of facts and claims of the respective parties, the single legal question presented for consideration and decision is whether plaintiffs are entitled to recover from defendants the amount of said proceeds arising from the sale of their share or proportion of said cotton. The plaintiffs' right to recover is resisted on two distinct grounds: First, it is insisted on behalf of defendants that, inasmuch as no particular 34 bales could be selected out of the damaged lot of cotton on its arrival at Chattanooga, and be forwarded to plaintiffs as their own cotton,

Samuels, the master of the Myra, under the maritime law had the right, and it was his duty, to sell the injured cargo; that, having the right to sell as master under the circumstances surrounding the cotton, Samuels had the right to select the defendants as cotton factors to make the sale; that he had also authority to receive or collect the proceeds, and distribute the same among the several owners of the cotton; and that, having exercised these rights, and collected the money for the cotton sold, his failure to pay the same over to the rightful owners is a mere breach of his authorized agency, and a matter with which defendants are not concerned, and in no way responsible. This position is rested upon the authority of *Jordan* v. *Insurance Co.*, 1 Story, 342. *The Velona*, 3 Ware, 139, and *Miston* v. *Lord*, 1 Blatchf. 354, which hold that in cases of calamity or unforeseen and unprovided necessity during the voyage the law clothes the master with the authority of a supercargo, and authorizes him to make such disposition of the cargo as will be most for the interest of the owners, upon whom his acts done under such circumstances, and in the exercise of a sound discretion, are binding. But the rule laid down in those cases has no application to the present. The Myra, in respect to plaintiffs' cotton, had completed her voyage when she reached Chattanooga, and the cotton was at its place of destination so far as concerned the boat and her master. No case has been found going to the extent of holding that the master may sell his cargo damaged during the voyage after the vessel and cargo have reached their destination and the voyage is completed, and the owner or owners of the damaged cargo can be readily reached, or easily communicated with for instructions. The rule announced in the cases relied on by defendants' counsel rests upon a principle of necessity, growing out of accidents or calamities occurring during the voyage in positions or places where the master cannot communicate with or receive instructions from the owner of the cargo. It is doubtful whether it can or should be applied to our inland navigation, where the means of communication with owners or consignees of cargoes are easy and readily accessible. But the master's authority to sell either vessel or cargo is subject to well-defined restrictions. His sale is only valid when made in good faith from necessity, which must arise from an impending peril; and he should not sell in any case without first giving notice to the owner, if the circumstances admit of the necessary delay. "The true criterion for determining the occurrence of the master's authority to sell is the inquiry whether the owners or insurers, when they are not distant from the scene of stranding, can, by the earliest use of the ordinary means to convey intelligence, be informed of the situation of the vessel in time to direct the master before she will probably be lost." *Insurance Co.* v. *The Sarah Ann*, 13 Pet. 401. In this case it is also held that the burden of proving the necessity for the sale by the master, and his good faith in making it, rest upon the person claiming under such sale. To maintain the purchaser's ownership under sale by the master against the claim of the original owner he must show "that the necessity for a sale had arisen; and that it was made in the good faith and sound discretion of the master." In *Pike* v. *Balch*, 38 Me. 302, it was held that

the master was bound to notify the owners, if possible, before selling the cargo; and in the case of *The Joshua Barker*, Abb. Adm. 215, the same rule was announced. In this last case, a vessel having on board a cargo of flour for transportation, capsized at her wharf before sailing, and the cargo was much damaged. The carriers might easily have sought instructions from the owners of the cargo by telegraph, or by sending a special messenger, who could have returned within 24 hours; but they neglected to do so, and sold the cargo upon their own authority, at auction. It was held that the sale of the flour, under those circumstances, was an unlawful conversion by the carrier.

Now, testing the authority of the master in the present case by these qualifications or restrictions upon the general rule relied on by counsel for defendants, it is very clear that Samuels, the master of the Myra, had no right, and was under no duty, to sell the plaintiffs' damaged cotton. No peril was impending over that cotton after its arrival at Chattanooga, and after it was there stored in the warehouse. The master could readily have communicated with, and received instructions from, the plaintiffs at Cincinnati. There was no probability of the cotton being lost or rendered worthless by the delay that might ensue from the master's communicating with and receiving instructions from the plaintiffs by the ordinary means of conveying intelligence. There was no difficulty or danger of loss in storing the damaged cotton for account of the several owners, and notifying them of its situation and condition; and lastly, the master's conduct in the transaction was clearly wanting in that good faith which is essential to the exercise of his authority to sell in order to divest the title of the rightful or original owner. The facts of the case do not sustain the proposition that Samuels, by virtue of his position as master, had authority to sell plaintiffs' cotton. On the contrary, they establish that his shipment of the cotton to defendants for sale was without necessity, and that in so dealing with it he was acting tortiously and wrongfully, with the fraudulent intent and purpose of converting the proceeds to his own use. But, aside from this, it clearly appears that he did not undertake to sell the cotton in the exercise of any agency authority; nor did defendants deal with him as master, or in any other capacity than as owner of the cotton. They received the shipment from Samuels as owner, advanced him money on the cotton in his own name and right, and opened an account with him individually as the owner of the consignment, and undertook to account to him, and him alone, for the proceeds arising from the sale of the cotton. It is not claimed or pretended that defendants were deceived or misled by any representations made by Samuels touching his exercise of an express or implied authority to sell the cotton by virtue of his position as master, and from the necessity of the case. On the contrary, it is distinctly stated by Mr. Fontaine that the defendants had no knowledge, notice, or information when they received the cotton, and made Samuels advances on it by paying his drafts drawn on them, that said Samuels had or bore any agency relation to or connection with the cotton; that the defendants supposed he was the real owner, and dealt with him as such. Under these cir-

cumstances the question of Samuels' apparent or abused powers and authority as master cuts no figure in the case, and furnishes no ground of defense to the plaintiffs' right to follow their cotton or its proceeds into the hands of the defendants. Again, it is well settled that a factor or agent who has power or authority to sell the property of his principal has no power to affect the property by tortiously pledging it as a security for a debt of his own, and it is of no consequence that the pledgee is ignorant of the agents or factors not being the owner. When goods are so pledged or disposed of, the principal may recover them back by an action of trover against the pawnee, without tendering him the sum for which the goods were pledged. *Warner* v. *Martin*, 11 How. 224, and cases cited, and *Bank* v. *Trenholm*, 12 Heisk. 520, and cases cited. It has not been, nor could it be properly, claimed that Samuels' position as a common carrier of the cotton, constituting him an ordinary bailee for hire, (assuming that he was the owner of the Myra,) gave him any authority to sell or pledge the plaintiffs' property. In his capacity as carrier his duty was to carry the cotton to and deliver it at Chattanooga. "Such possession by a carrier of goods is not even *prima facie* evidence of any ownership, or of any general authority over the goods, except such as is strictly incident to, and limited by, his duties as carrier; and third persons dealing with him in reference to the goods do so at their peril." *The T. A. Goddard*, 12 Fed. Rep. 182, and cases cited. After the cotton arrived at Chattanooga, Samuels had no power or authority, either under the maritime or common law, to reship it to defendants, and procure advances upon it for his own account. It follows, therefore, that in no view which can be taken of Samuels' connection with or relation to the cotton in question can his action in consigning the same to defendants, and obtaining advances thereon for his own use and benefit, confer upon the defendants any right to the cotton or its proceeds as against the true owners. In thus dealing with the cotton, Samuels was in no sense, and under no law, acting as plaintiffs' agent, so as to require them to look to him, rather than to defendants, for the proceeds of their property.

The next ground of defense assumed, and the one most earnestly insisted upon by counsel for defendants, is that defendants acted in the transaction merely as cotton factors or agents to sell; that the money which they paid to or for Samuels on his drafts before receiving the cotton should be regarded as merely turning over to him, in advance, the proceeds of its future sale; and that in thus dealing with Samuels and the cotton they acted in good faith, under the belief that he was the real owner of the property, and in ignorance of the plaintiffs' rights. It is urged that, under such circumstances and conditions, however wrongful and unauthorized the conduct of Samuels may have been, they are brought within the principle, and are entitled to the protection of, the rule laid down in the case of *Roach* v. *Turk*, 9 Heisk. 708–719, where it was held that "the mere act of selling goods obtained from an unauthorized agent, with no knowledge of the principal's title, will not render a factor liable for a conversion." That "to make the factor liable, a de-

mand must be made while the goods or their proceeds are in his hands; or notice of the owner's title, or want of title in the party from whom they are received, must be brought home to him, and thus fix upon him a wrongful assertion of dominion over them in defiance of the owner's right." This decision overruled the previous case of *Taylor* v. *Pope*, 5 Cold. 413, which had announced a directly contrary doctrine. In *Roach* v. *Turk* the facts were briefly these: Turk & Hawkins sent three bales of cotton to one Moseby, a shipping agent at Commerce Landing on the Mississippi river, to be shipped to A. J. Roach & Co., commission merchants at Memphis. Moseby was absent when the cotton arrived at said landing, and it was delivered to his clerk, J. W. Ware, with the owner's directions as to its shipment. Instead of shipping the cotton as directed for account of Turk & Hawkins, Ware forwarded the cotton to Roach & Co., in his own name, and as his own property, with directions to hold it until further orders. A few days after the cotton was received by Roach & Co., Ware came to Memphis, and directed them to sell the cotton, which they did; and Ware having identified himself as the party who had made the shipment to them, Roach & Co. paid over to him the proceeds of the cotton. Ware soon after absconded. A short time afterwards, Turk, one of the owners, came to Memphis, called upon Roach & Co., inquired about the cotton, and ascertained that it had been sold as aforesaid, and that the proceeds had been paid over to Ware. Turk thereupon demanded the proceeds of the cotton from Roach & Co. They refused to comply with the demand, and Turk & Hawkins then brought suit against them for the same, and it was held that they were not entitled to recover; the ground of this holding being that Roach & Co., in receiving and selling the cotton, and in paying over the proceeds to Ware, from whom they received the cotton, acted merely as sale agents; that, having so acted in good faith, and paid over the proceeds before any demand was made upon them by the true owners, or any notice of their rights, the factors were not guilty of a conversion of the cotton, and could not therefore be held liable to the owners for its proceeds. It is a matter of grave doubt whether this case can be reconciled with the great current of authority on the point involved and decided; but, without pausing to consider that question, we are clearly of the opinion that the rule laid down in *Roach* v. *Turk*, if recognized and adhered to at all, should, in its application, be limited and confined strictly to the precise point decided therein, which was simply this: That a factor who in good faith executed for one who is not the owner a mere agency to sell goods, and who turns over the proceeds of such sales to the wrong-doer before any demand is made upon him by the true owner, or before receiving notice of the owner's rights, is not liable for a conversion of the goods. In thus limiting that decision it does not cover or control the present case, which, in several material respects, is clearly distinguishable from it. The defendants in this case were not simply factors executing a mere agency in selling the cotton and paying over the proceeds before notice of plaintiffs' rights. In the transaction they occupied and sustained towards Samuels the dual character of creditors and factors.

They loaned or advanced their own funds to Samuels, thereby becoming his creditors. It is true, they did this upon the faith of the cotton which he consigned them; but in making these advances they acquired no valid title to, or lien upon, the cotton as against the plaintiffs. This is conceded in *Roach* v. *Turk*, and admits of no question. Having made such advances, and constituted themselves creditors of Samuels, they receive the cotton, and assume the right to sell it as his factors for their own reimbursement. While the proceeds of the cotton are still in their own hands they receive notice of plaintiffs' rights. They receive this notice before Samuels is actually credited with the proceeds, except to the extent of $121.22. But whether the entire proceeds were actually credited to Samuels before or after receiving notice of plaintiffs' rights is not material. The fact remains in either case that the proceeds of the cotton were in defendants' hands as creditors or factors, or in both capacities, when they were notified of plaintiffs' title to the cotton, and their right to the proceeds. The defendants claimed the right to hold these proceeds, and apply them towards the repayment of their advances previously made to Samuels. They were entitled to do this if, when they made such advances, they acquired any title to or lien upon the cotton as against the plaintiffs. But it is too clear for argument or the citation of authorities in its support that they acquired no title to or lien upon the cotton as against the real owners, and that they could not have held the cotton against the demand of the plaintiffs if such demand had been made before the same was sold. Upon what principle can defendants assert or maintain a right to the proceeds superior to what they could have lawfully claimed over or against the cotton itself? Did their sale of the cotton, which was a wrongful act so far as plaintiffs' rights were concerned, whether it amounted to a conversion or not, enlarge their rights, or put them in any better position in respect to the proceeds of such sale than they occupied while holding the cotton itself?

We are called upon to hold that defendants' creditor relation to Samuels entitled them, as factors, to retain the proceeds of cotton belonging to plaintiffs, and apply such proceeds to their own reimbursement for advances previously made to the fraudulent wrong-doer. In other words, the proposition comes to this: that because defendants became creditors of Samuels on the faith of his being the owner of the cotton, they should now, after notice that plaintiffs are and were then the rightful owners, be allowed to apply the proceeds, which justly and equitably belong to plaintiffs, to the payment of Samuels' debt. If *Roach* v. *Turk* was ever meant to assert or lay down such doctrine, its authority would neither be recognized nor followed by this court. When notice of plaintiffs' rights reached defendants they had then and thereafter received into their hands the proceeds arising from the sale of plaintiffs' property. They cannot hold these proceeds against the rightful claim and demand of the plaintiffs, no matter what their transactions with or relations to Samuels may have been. Samuels, as a tortious wrong-doer, could confer upon defendants no right to the cotton or its proceeds as against the real owners, and when the plaintiffs' notice found the proceeds of the cotton in the hands of de-

fendants, they then fixed against defendants a liability to account to them for the same. The present case is not, in principle, distinguishable from that of *Bank* v. *Trenholm*, 12 Heisk. 520–525, in which the factors in possession, with authority to sell, effected a loan from the bank for their own account, and pledged the goods as security for its repayment. The bank supposed the factors were the owners of the goods, took possession of them, and subsequently sold the same, and applied the proceeds towards the payment of the amount due it by the factors. The real owners sued the bank for such proceeds, and recovered; the court holding that the act of the factors in thus dealing with the goods was a conversion on their part; that the bank was likewise guilty of a conversion when it took possession and assumed control of the goods, although ignorant of the true owners' rights; and that the bank could not retain the proceeds of the goods as against the owners. In that case it was urged that no action for a conversion could be maintained against the bank without a demand being made for the goods, but the court said: "The property having been sold by the bank before the action, no demand was necessary. The authorities, we think, will show that a demand of possession, and a refusal, as evidence of a conversion, are required only in those cases where the possession was rightfully acquired, and not where the act of taking possession was itself a conversion;" citing several Tennessee authorities. If the act of the bank in taking possession of the goods in that case was of itself a conversion as against the true owners, how can it be said that the act of the defendants in taking possession of the cotton in question and asserting the right to sell it for the purpose of reimbursing themselves, was not likewise a conversion as against the plaintiffs? In this case, as in that, the possession of the goods was not rightfully acquired, and the control which was assumed of and over the property was inconsistent with the rights of the owner, and constituted a conversion. Can we properly apply one rule of law to banks in such cases, and a different rule to cotton factors and commission merchants? If so, upon what principle? It was also argued in that case that, as the factors were empowered to sell, and the bank sold by their direction, and paid the proceeds on their debt, the result of the transaction was the same thing as if the factors had themselves sold and received the money; but the court declined to recognize the correctness of this position, which is practically the same as that argued in behalf of defendants in the present case, when it is suggested that the funds which they loaned Samuels before the cotton was received, should be regarded as the proceeds of the cotton turned over to him in advance, so as to bring the case within the rule laid down in *Roach* v. *Turk*; but this suggestion is not well founded. The defendants advanced their own funds, on which they charged Samuels interest. After selling the cotton, they seek to retain the proceeds as against the owner, and apply the same towards what they had so loaned Samuels. The case of *Roach* v. *Turk* does not sustain their claims, nor is it supported by either principle or authority. On the contrary, the principle announced in *Bank* v. *Trenholm*, 12 Heisk. 520, and *Warner* v. *Martin*, 11 How. 224–227,

and numerous other authorities that could be cited if necessary, clearly establish plaintiffs' right to recover the proceeds of their cotton in the hands of the defendants.

It is proper to state in conclusion that neither the facts of the case, nor the law applicable thereto, (and which must control the rights of the parties,) in any way either involves or implies any want of personal or commercial integrity on the part of the defendants. They have simply labored under a misapprehension of the legal principles which govern the rights of themselves and the plaintiffs; but there is nothing in their conduct which in the least impairs or reflects upon their high mercantile character. The plaintiffs are entitled to recover of the defendants the sum of $951.35, with interest since February 1, 1886, together with the costs of this suit; for which judgment is accordingly awarded.

HAMMOND, J., (*dissenting.*) With much hesitation, and a genuine diffidence growing out of my own doubts as well as out of my thorough confidence in the opinions of the learned circuit judge, I announce a disagreement with the foregoing judgment, and my conclusion that the case should be decided for the defendants. This disagreement relates somewhat to the facts as well as to the law of the case. Not that the substantial facts have not been most accurately stated by the circuit judge, but I disagree as to some of the inferences of fact made by him, as will appear presently. It may be that the plaintiffs are entitled to judgment in any view that may be taken of the facts of this case; but, if so, it can only be, in my conception of the law, upon the broad and bold ground of *Hoffman* v. *Carow*, 20 Wend. 21, 22 Wend. 285, and not upon any other ground whatever. Certainly are they not to be made liable, I suggest, by the artificial construction of any dual relation that the defendants bore to Samuels, whereby they became, on the one hand, mere agents to sell goods, and on the other, brokers, money lenders, pawnees, pledgees, or some like relation, by whatever name designated, with the necessary relation of creditor and debtor antecedently created in order to bring them within the liability for which it is suggested they must be held, upon the cases which have been cited. It is quite true they were creditor and debtor in a broad sense, and in every sense of liability *inter sese;* but not, I should think, as to third parties, did they hold that relation in the sense that the defendants were creditors appropriating this property to the payment of their debt, either by reason of a lien upon it or because of any supposed right to do that thing, arising out of any claim by contract, express or implied, or because of any supposed authority whatever. They were, indeed, mere agents to sell, just as much as auctioneers or brokers would be; and particularly so in this case, which was an isolated transaction, disconnected with any other, and wholly inconsistent with the notion that the cotton was pawned or pledged to secure a debt either antecedent or concurrent,—certainly not an antecedent or pre-existing debt; and I quite disagree with all the inferences of fact or reasoning upon the facts by which the presiding judge establishes any other relation for them than that of agents to sell the cotton.

The pivotal inference of fact with which I disagree is that the defendants lent Samuels the money advanced "before the cotton was received," and asserted "the right to sell it for the purpose of reimbursing themselves." The cotton was shipped to them on December 2d, and they were in possession of the bill of lading before the advancements were made, though the cotton did not arrive until a few days afterwards. The contract of the defendants was to sell the cotton as commission merchants, and pay over the proceeds, according to the usages of trade, less commissions and other charges for storage, insurance, and the like; and that of Samuels was to pay those charges, and not to withdraw the commission of agency to sell until those charges were satisfied, including any advances that might be made, and these stood on precisely the same ground, in a case like this, as the other charges. Any bare agent to sell, like an auctioneer, factor, or broker, may and must put the property in a salable condition, according to the usages of the trade, just as these defendants did, and he may likewise make advances upon it as an incident of a bare agency to sell only; and he does not thereby become, I should say, a creditor with an antecedent debt for which the property is pledged in any sense whatever, but remains an auctioneer, or broker, or other like mere agent to sell, and stands, in relation to third parties, precisely as if he had paid over the proceeds after, instead of in advance of, the sale. And I take it that an auctioneer who advances one-half the value of the goods, and after the sale pays over the other half, would occupy no different relation, or stand in no different attitude, in a case like this, towards the rightful owner or other third party, as to either half, than that which he bore as to the other half. Nor can this be at all changed by calling the mere agent to sell a factor or commission merchant. It is very true that this class of agents sometimes do so enlarge their dealings that they get away from the bare agency to sell, and become in fact money-lending creditors, with deposited securities and accompanying liens, such as mortgagees, pledgees, pawnbrokers, bankers even, and the like; and it is often difficult to define their exact relation growing out of the complicated and multifarious conditions that surround their transactions; this being especially so in the cotton trade, as we know it in this region, where the so-called "factor" or "commission merchant," through his banking operations and outside dealings, becomes a very curious sort of trader, and is sometimes in the last analysis probably only a cotton planter dealing with himself, notwithstanding his delusions and those of others upon this subject. These complications are well illustrated in the cases of *Allen* v. *Bank*, 120 U. S. 20, 7 Sup. Ct. Rep. 460, and *Bank* v. *Trenholm*, 12 Heisk. 520, cited by the presiding judge.

But we must be careful not to assimilate a simple transaction like that shown by the proof in this case—of one employed to sell an isolated and particular lot of damaged goods—to the complicated transactions like those found in the cases just mentioned, merely because the agent so employed has exercised the common privilege belonging to auctioneers and brokers for sale, of advancing the price of the goods. It is an unnecessary implication from the simple fact of the advance of the proceeds before the sale that

the defendants became aught else than mere agents to sell this cotton. They did charge what they call in their account "interest," it is true, but they may as well have called it "commissions for advancing," or "commissions for selling," or have added it to those charges; but it does not seem to me to materially alter the transaction in its legal aspects, that they called it "interest." It is not their state of mind as to the relation they bore to Samuels, or their misconceptions of the transaction, with which we are dealing, but its true legal character. In my view, they were simple agents to sell this particular lot of cotton, employed by a thief, if you choose to ignore the relation of carrier to the goods, and to put the case most strongly against the defendants, to whom they paid over the proceeds in ignorance of the theft or the rights of the true owner. And the fact that they paid the estimated proceeds before the sale, and kept their books so that it appeared to be a debt which they did not liquidate by actual credits on the page of accounts until after notice from the real owner, although they previously and actually had the money in hand, cannot increase or materially change the legal character of their relation to the transaction. All but four bales at most, and possibly all but one bale, of this cotton were in fact sold before the notice, as I understand the facts, and the price collected, but in the process of the book-keeping the credits were not, some of them, made till afterwards, as the circuit judge states. But I disagree as to the inferences drawn from these circumstances to alter the defendants' relation to the transaction in any way from that which I have described. Indeed, it seems to me, that all the cases cited of a factor's tortious or unauthorized dealings with goods placed in his hands for sale by the rightful owner are somewhat beside this case, and that it is a mistake, and, in one sense, a distortion of the facts we have here, where the goods were placed in the factor's hands by one not the owner, to liken them to the other cases, either in fact or principle of law. As was said by Mr. Justice WAYNE in Warner v. Martin, 11 How. 209, 229: "It is a misconception arising from the misapplication of correct principles to a case not belonging to any one of them."

In my view, aside from the branch of the case which concerns the powers of a master of a vessel over a damaged part of his cargo, this proof presents the naked question whether an agent, wholly innocent of any wrong in knowledge or intent, who sells for a thief or other wrongful possessor of goods, is liable in trover for conversion, or in assumpsit for money had and received, or in any other form of action, to the rightful owner, where he has paid the proceeds over to the wrong-doer, either before or after the sale, and before any notice to him of the wrong done. I treat the case as if the payment before or after sale were quite immaterial, so it be made, in fact, before notice, actual or constructive; for there is nothing in this case to charge defendants with either kind of notice, as all agree. The case of Hoffman v. Carow, supra, is directly in favor of the affirmative of this question, and emphatically against the defendants; for I should say that it is of no consequence whether the agent who sells be called an "auctioneer," "broker," "factor," or what not, where the original tort-feasor is wholly without authority over the goods in the

matter of selling them, whether he be a plain thief or a dishonest or mistaken bailee of the rightful owner, appropriating them, through the agency, to his own use.

That branch of this case which concerns Samuels' powers, as master, over a damaged cargo, will be considered separately, because I think it is quite well settled that a mere carrier, whether by land or water, like a wharfinger, warehouseman, or some such bailee, whose custody is entirely disconnected with any duty of selling the goods, stands, in considering the present question, in no better attitude than a simple thief, when he undertakes to sell, either directly or through an agent employed to sell the goods. This was certainly so at common law and in the absence of the modern factor's acts, like 6 Geo. IV. c. 94; 5 & 6 Vict. c. 39, and those acts which are similar that have been passed by many of our states, but never by the state of Tennessee, which fact is an important consideration that should not be overlooked in cases like this. The case of *Warner* v. *Martin, supra,* cited by the circuit judge, plainly and intentionally points out that the effect of these acts of legislation has been misunderstood and misapplied in cases like this, even where they exist; and it is my belief that the courts in Tennessee have sometimes extended this misapplication in discussing the laws of a state which has no such acts, by unconsciously importing from them principles that could not be sustained as a part of the common law. Furthermore, if it may be said that these factor's acts only declare equitable principles already ingrafted upon the common law,—which suggestion is contrary to the implication to be drawn from their very existence,—then it seems to me that those principles do not find any proper application to a case like this, except, it may be, in that feature which may be called the "maritime" branch of this case; because the defendants here are surely liable whenever you look at them as purchasers from Samuels, in any sense whatever, for the reason that they are met with the clear fact that Samuels had nothing to sell—no title whatever—apart from whatever implied powers he had as master of a vessel under the maritime law, not now to be considered. He was no agent to sell in any way otherwise than as master, and in no other possible view could there be invoked in behalf of a purchaser from him those just and enlarged principles established in favor of commerce by the factor's acts, or drawn from the supposed equitable principles developed by the expansion of the rigorous common law of the subject. Only in behalf of innocent purchasers without notice, or without knowledge of facts equivalent to notice, from an agent to sell, or one invested with the documentary *indicia* of title, could those principles be applied; and a simple carrier for transportation can never be such an agent, unless, forsooth, there be special circumstances, not pretended to exist here, which would change him from a simple carrier into another kind of agent, and one with powers of sale attached. The defendants cannot be excused as purchasers, except from a bailee with powers of sale, express or implied; and, aside from his possible powers as master, a carrier is never in any sense such a bailee; wherefore it has seemed to me all along impossible to sustain any defense on the above-mentioned equi-

table or legislative principles concerning purchases made from factors. Samuels was no factor, nor any agent to sell,—apart from his relation as master,—and it seems to me most important to keep this fact always prominently in view before we can arrive at any clear conception of the legal principles involved in this case.

Stripping the case, then, to its exact proportions, on this branch of it we have only the question whether or not *Hoffman* v. *Carow, supra,* which held that an auctioneer selling for a thief, and paying to him the proceeds, without notice of the trespass, was liable in trover, be the law of this case.. I doubt it, in the interest of commerce and the convenience of its vast operations, so dependent on these agencies. This doubt has no concern with the assumed position that the plaintiffs here, having intrusted this cotton to Samuels for carriage, and thereby put him in possession as a badge of ownership, have trusted most, and must lose because of that trust, rather than that the defendants shall lose for having innocently trusted also, nor upon any principle that there is an estoppel *in pais* because of that trust for carriage by the plaintiff,—not at all, for those principles, as before remarked, have no place here, in my judgment; but the doubt is based solely upon a conviction that the part that the defendants took in this transaction cannot be maintained to have been a conversion of the goods to their own use by the defendants in any proper legal sense. The defendant firm was the mere conduit through which the goods passed to the market, and should be no more held for a conversion than the railroad which brought the damaged cotton to the market, the pickery which prepared it for sale, or any bank into which the proceeds may have been deposited and paid out by check. Nothing stuck to their fingers except the commissions, and in strict law, if nothing else interposes, they should be held liable to that extent, perhaps, and for the cotton on hand at the moment of notice, which had not been sold to any purchaser,—at most four bales in this case. The mere asportation of one's goods, and the bare handling of them in transit or in store, even though that handling go to the extent of selling them as the agent for sale of him who is wrongfully in possession, cannot, it seems to me, be properly said to be a conversion of them to one's own use, without more. If defendants had paid any antecedent debt due to them from the trespasser, disconnected from the goods, or had received any other benefit whatever, they would be liable to that extent; or if the plaintiffs had found the proceeds in their hands they would be liable; but on the facts of this case nothing of that kind occurred in any proper view of the facts, and all that has been attempted to bring the case within that liability is purely artificial in any view, and though, possibly, plausible enough, not at all real.

The English cases cited in *Hoffman* v. *Carow,* in the opinions and by the briefs of counsel, are, along with many others, considered in the note in 2 Wms. Saund. (Ed. 1828,) 47, (and a still later edition, page 108, that I have not seen,) which is recognized as in itself authority by the courts, and in the later case of *Lee* v. *Bayes,* 18 C. B. 599, where WILLIAMS, J., the author of the note, says that there is confusion in the cases

bearing upon the position which servants and agents employed in the course of trade occupy in regard to the action of trover; and I think a critical examination of still later cases will show that the law of *Hoffman* v. *Carow* has not been as yet satisfactorily settled in England, any more than it has been in this country. In that case of *Lee* v. *Bayes* the bailee, Robinson, was in possession of the stolen horse as a keeper for one who had purchased without title being acquired, and, on demand, refused to give him up, but claimed to hold him for his bailor, and also claimed a lien for his keep; which was held a conversion. But the implication clearly is that if he had returned the horse to his bailor there would have been no conversion, certainly not if the return had been before any knowledge of the plaintiff's rights. Indeed, it seems to be well understood that the bailee may in good faith return the stolen goods to the thief without liability in trover. 1 Benj. Sales, (Corbin's Ed.) 13, note 2. If this be so, why may not the proceeds of sale be also returned by one who is only the agent to sell, if he acts innocently and without knowledge of the theft, and without benefit to himself? I perfectly comprehend the reason given in the cases which establish the liability of an agent to sell, that the mere act of sale, whether for one's self or another, is in itself a conversion, but that seems to me a begging of the point in issue, and quite inconsistent with the legal meaning of the word "conversion," established when the action of trover was first invented. If the defendant cut down trees, and leave them lying in the place where they were felled, he cannot be said to have converted the trees. 2 Wms. Saund. 47*e;* Bull. N. P. 44; *Mires* v. *Solebay*, 2 Mod. 242. Why? Because the element of an appropriation in some degree of the thing converted to one's own use is essential to the very idea of a conversion. Not beneficially always, but either expressly or impliedly, there must be such a technical appropriation,—there must not only be a trespass or trover, but likewise a conversion, in some sense at least; and in the old books the action is called "trover and conversion." In the case cited of *Mires* v. *Solebay, supra,* the action was against a servant for conversion in driving his master's sheep to the master's pasture, where he left them. It was held no conversion, although there was demand and refusal, which is only evidence of a conversion, and, as all the books show, not necessarily conclusive, for there may have been no conversion, notwithstanding the demand. The court says that the conversion will not be implied from the refusal; "or, if the conversion was to the use of the master, there is no color for this action to be brought against the defendant, but it ought to be brought against the master."

It is said in Buller's Nisi Prius, on the authority of this and other cases, that, if "actual conversion" be proved, it is not necessary to prove a demand; and where "it is apparent the defendant has made no conversion, a demand and refusal is no evidence," and the illustration of the trees, above made, is given from that case. There may be, undoubtedly, a taking by the servant at the command of the master or without it, and that, too, when both are ignorant of the wrong, and there does arise out of the circumstances the implication of an appropriation

to the use of either from the very wrongful taking itself, as if one should take, or command his servant to take, from the head of another his cap, (to use an illustration from the old writers,) and then no demand and refusal need be proved; but, to use the language of Buller again, this does not apply to the cases where the goods came to the hands of the defendant "by delivery, finding, or bailment," in which case demand and refusal are necessary, for the obvious purpose of giving notice of the plaintiff's right, and an opportunity to return the goods, unless, indeed, the proof shows "an actual conversion," which means an actual appropriation by the defendant to his own use, or a wrongful intent to deprive the plaintiff of it. *Simmons* v. *Lillystone*, 8 Exch. 437. Now, if before this essential demand and refusal the servant has restored the goods to his master, or their proceeds, if they be sold by his order, how can it ever be said that a refusal to comply with a demand for their return to the rightful owner is the least evidence of conversion by the servant? I know there are cases and books which say that the mere asportation of one's goods, or the mere sale of them, or any intermeddling which aids in passing them to another, is a conversion; but I have examined the original cases to find whether upon principle and in the nature of the thing these broad declarations can be correct when we get away from the complications of the facts of each particular case brought to judgment. Is it not precisely the case put by the learned Mr. Justice BLACKBURN in a modern adjudication, which I shall presently cite, when he took occasion, in his always able analysis of principles, to halt in the rigorous application of the underlying common-law maxims that nourish the roots of all these cases, and put to the lords this question: "If a man deliver the oats of another to B., to be made oatmeal, and the owner afterwards prohibits him, yet B. makes the oatmeal, this is a conversion.   *   *   * But suppose the miller had honestly ground the oats, and delivered the meal to the person who brought the oats to him, before he ever heard of the true owner, how would the law be then?" The learned justice declined to say, distinguishing the case he had in hand upon facts very analogous to those we have here, but yet, notwithstanding the plausible similarity, quite as distinct from this case as the one he so forcibly imagined was from that which he decided, as it seems to me. And I may add to the question: Would the fact that the miller retained the product of his toll-dish, or that he, in advance of the grinding, substituted, as millers often do, oatmeal already on hand, have altered the law of the case put by the question of his lordship? If not, I see no distinction between that imaginary case and this. *Hollins* v. *Fowler*, L. R. 7 H. L. 757, 768; same case *sub nom. Fowler* v. *Hollins*, L. R. 7 Q. B. 616. In that case many able opinions were delivered, two of the judges summoned by the lords dissenting, and the whole subject was carefully reviewed. And it must be conceded that, notwithstanding the differences of technical judgment which distinguish that case from this, opinions were there expressed which support very strongly the judgment of the circuit judge in this case. But Mr. Benjamin, who, like Mr. Sergeant Williams, the original annotator of Saunders' Reports, is recognized au-

thority, demonstrates that, notwithstanding the decision in that great case, it does not "detract from the value of Mr. Justice BRETTS' judgment as an exposition of the law as to brokers' liabilities." 1 Benj. Sales, (Corbin's Ed.) p. 266, § 245. That judgment of Mr. Justice BRETT was delivered in the court below, where the original decision of the queen's bench was affirmed by an equally divided court. *Fowler* v. *Hollins, supra,* 621.

If that opinion of Mr. Justice BRETT be the law,—and, with all deference to others, I think it is,—the defendants cannot be liable here. It is in one sense a dissenting opinion, and again in the house of lords he dissents in a more technical sense with an opinion supplemental to the other; but after all, if the opinions of the majority judges be stripped to their technical proportions, what they say that is to the contrary of Mr. Justice BRETT is *obiter dicta,* thus leaving all the expressions of opinion, so far as relates to the principles governing this case, about of equal value with us. Let me explain this so that the full force of this latest review of the English commercial law of this subject may be understood and not misunderstood in favor of either side to the controversy. Hollins was a broker for purchase,—not for sale,—and by the verdict of the jury he was found to be only acting as an agent in that transaction, and not for himself as a purchaser for profit; but the whole case shows that the judges who held him liable for conversion, notwithstanding the verdict, held that verdict to mean on the facts that he was in truth a purchaser, to whom the title had passed,—a purchaser for speculation; and not one of the judges in any of the courts doubted his liability on that score,—if that were the true category to which he belonged,—on the facts. BRETT, J., and those judges who agreed with him, thought the verdict conclusive against such an interpretation of the facts, and he wished to have the case decided upon the law of the verdict as he interpreted it, namely, that Hollins was a simple agent to buy and sell the cotton of others in which he had no title or interest except his own commissions. The other judges in all the courts declined this view of the facts. Some of them, but not a majority, I take it, were willing to hold the broker liable on Mr. Justice BRETT's view of the facts, but altogether the most that can be said is that the law of England upon the point as we have it here presented is in great confusion, and yet unsettled, as it is in America; and this fact justifies the dissent I venture with the utmost diffidence to make in this place, to the end that the supreme court of the United States may settle the doubt.

I have not gone over the abundant cases to pick out such as will sustain the view I take. They will be found cited numerously on both sides in the authorities and cases to which I have referred. I have examined many of them, and could review them here, but deem it useless, under the circumstances, to go over what has been so thoroughly done by the learned judges of England so recently. But it is proper to call attention to the more recent case of *Arnold* v. *Bank,* L. R. 1 C. P. Div. 578, where the defendant bank was held for a conversion in dealing innocently with a forged bill of exchange, which it paid over immediately to the fraudulent holder; and to the case of *Cundy* v. *Lindsay,* L. R. 3

App. Cas. 459, L. R. 2 Q. B. Div. 96, L. R. 1 Q. B. Div. 848, where again the English cases on the doctrine of conversion are considered very instructively. Likewise I shall specially call attention to the older case of *Hardman* v. *Booth*, 1 Hurl. & C. 802, where an auctioneer advanced the price of goods to a fraudulent customer, and was held in trover, as to which it can only be said that the case was commented upon approvingly by some of the judges in the above-cited cases, who were willing to go to the extent of holding, with *Hoffman* v *Carow*, that a mere age it to sell is guilty of conversion by the bare act of selling itself; but it was involved, like *Stephens* v. *Elwall*, 4 Maule & S. 259, where a clerk was held who did nothing but forward the goods to his principal,—who was in a foreign land, let it be noticed, which, some of the cases hold, makes a difference,—in the confusing conflict of opinion still prevailing on the question there. These last are the strongest cases for the plaintiff, and, if they are the law of the case, the defendants are undoubtedly liable on this branch of it; but if the conflicting cases so ably considered by Mr. Justice BRETT and the judges agreeing with him in his two opinions in the exchequer chamber and in the house of lords support those opinions, then the defendants are not liable. And it is noticeable that the obvious hardship of the strict rule in favor of plaintiffs evokes from some of the judges willing to hold to it a suggestion of legislation to change it, while others maintain its wisdom in behalf of the security of property.

I have searched quite diligently for some indication of the sentiment of the supreme court of the United States, but in vain, unless the circumstance may be in favor of defendants here that in *Warner* v. *Martin*, *supra*, 11 How. 228, Warner was not held liable to plaintiffs for that part of the tobacco which he had sold to Heald, Woodward & Co., but only for that part which he had retained in his hands, a joint judgment in the court below for the whole quantity being thus corrected. If a bare sale is a conversion *ipso facto*, he should have been held, as he was in the court below, for the whole amount. I do not find that that court has ever had occasion to cite the leading case of *Hoffman* v. *Carow*, *supra*. I have not traced all the American cases which will be found cited in the text-books and notes wherever *Hoffman* v. *Carow*, is cited, but have examined many of them, and it will be found, I think, that while most of the courts approve the doctrine of that case in a general way, there has been a constant disposition to mitigate the hardship of it by artificial distinctions, and the importation of legislative modifications from the factor's acts, and from equitable principles governing analogous situations in other but distinct relations between the parties to the transaction. The ruling in *Hoffman* v. *Carow*, *supra*, was, however, directly challenged at an early day, in California, upon the same grounds, substantially, as those taken by Mr. Justice BRETT in the opinions cited from the most recent English case. *Rogers* v. *Huie*, 2 Cal. 571. It holds that a mere agent to sell is not liable if he does nothing more than sell for the wrong-doer, as agent. Our Tennessee case of *Roach* v. *Turk*, 9 Heisk. 708, likewise challenges it, and upon the same grounds, as I understand that case, when it shall be reduced to its precise technical pro-

portions. Also, I understand, the circuit judge is willing to approve it, if at all, to that extent only. He distinguishes this case from that by making the defendants something more than mere agents to sell upon lines which seem to me somewhat artificial; but if it be the law, even to the degree that he seems willing to approve it, the defendants, being, in my opinion, nothing more than agents for sale, should be held on the authority of that case only to the extent already indicated, for the value or proceeds of the four bales on hand when they received notice, and so much of the other as they applied to their own use in the way of charges and commissions, and not at all for any money they actually paid over to Samuels before notice of plaintiffs' claim. The case of *Roach* v. *Turk*, *supra*, was preceded by one in Tennessee directly to the contrary of its rulings, and by it the earlier case is, in turn, overrruled. *Taylor* v. *Pope*, 5 Cold. 413. I agree that neither of these cases is technically binding on this court as authority, and that, on a question of commercial law like this, it is entirely competent for the United States courts to seek in the conflicting currents of authority the true principles of commercial intercourse, as established by generally accepted authority of law, as their guide. But this very conflict emboldens me to insist, with all deference, upon this dissent, although it may turn out that the final arbiter shall take the opposing view. In either of these cases, as in this, the bailee or depositary,—in whatever character you choose to consider him,—by whose wrongful conduct the plaintiffs' property was diverted from their own proper purposes and uses in respect of it, was wholly without any power of sale, or the least implication of it, and, moreover, without any such possession of either the property itself for any of its muniments of title or documentary belongings as that of which a power of sale could be predicated in fact, or the appearance of it from the surrounding circumstances. Therefore it does seem to me that much of the consideration of those principles of law by which, under either legislative direction and implication or any equitable doctrine of relief, purchasers from a factor or other agent in possession by consent of the acknowledged owner, and having special and limited powers of rightful agency, may be sometimes exempt from liability to adverse claimants, is, in the nature of the case, quite foreign to the subject with which we have to deal. In its legal aspects, as before remarked, the bailee in such cases, who is deserting his trust, which is only for carriage, or warehousing, or the like, and under no circumstances having a power of sale by implication or otherwise, stands in no better relation to the property and to those who deal with him and it, either as his agent or as purchasers from him, than a common thief would stand towards the property, such agents, and purchasers.

So the only real question that can arise is, in its nakedness: What amounts to a conversion to one's own use, in its legal sense, when one thus deals with stolen property and the thief? I answer it by saying: If one engaged in the general business of brokerage for sale, as a factor, commission merchant, auctioneer, or the like, accept in the regular course of his business such a commission from the thief, and, as his

agent, sell the property on hand, and pay over the proceeds to him without any knowledge of the theft, either directly or indirectly, or without the existence of suspicious circumstances sufficient to charge him with notice, constructively, he cannot be liable for a conversion, nor in any form of action, as *assumpsit*, to the rightful owner, whose only remedy is to pursue the property into the hands of its subsequent possessors, or the thief, or other fraudulent bailee, or both. Moreover, if the broker for sale should happen, under the circumstances described, and also in the regular course of his business, to advance money to his customer before the sale, he is in no worse attitude, and no more guilty of a conversion, than if he had paid the proceeds over after the sale. He no more has the proceeds in his hands in the one case than in the other, when the rightful owner appears. But if the transaction departs from that already described, and becomes in any sense one in which the title to the property or its ownership is attempted to be vested in or to be transferred by way of lien or otherwise to the broker himself, under an apprehension, however innocent, that the thief is the rightful owner, or has the power to make such disposition of it, then there is a conversion; for any assumption of ownership over another's property without his consent, or any attempt to acquire in it any interest of complete or partial and qualified ownership, is a trespass, and is wrongful of itself, although innocently attempted. A sale accompanied by such an assertion of ownership, express or implied, by way of title, lien, or other qualified right of property, is conclusive evidence of the conversion, for which the broker is liable; but a bare sale, without such accompaniment of assumed ownership, complete or qualified, is not in itself a trespass, and cannot be a conversion to one's own use because of the very want of that feature which is essential,—the claim or assertion of a beneficial ownership or interest, namely.

These are the deductions I make from my study of the authorities after getting out of the tangle and confusion found in them, as best I may, while I concede fully that there is abundant cause to believe that other students of them may untangle the confused cases in the opposite direction. And, applying this view to the case we have here, the precise point of difficulty is to determine whether the defendants' supposed lien as factors for their advancements and charges brings them within the one or the other of the above-described categories; because, if a bare sale without any pretense of ownership, complete or partial, or without any claim of property right or interest, makes them trespassers, and becomes, *ipso facto*, a conversion,—and it is possible, though not probable, that such a conclusion may be reached upon a consideration of the authorities,—then they are surely liable. But, passing the act of sale as not a conversion in itself, and examining their supposed interest in the cotton, arising by reason of their supposed lien, which did not exist in fact, of course, and we find, in my understanding of its nature, that such a lien is wholly disconnected with any property right or interest, complete or partial, and stands in hand as a simple possessory right unsupported by ownership of any kind, or pretense of it. A factor's lien is, like that of

a mechanical jobber or worker at repairing articles for use, that of an inn-keeper, or wharfinger, or carrier, or the like, possessory only,—*jus ad rem*, not *jus in re*,—and does not at all depend upon any qualified own-ership of the factor to support it. Edw. Bailm. § 365 *et seq.; Brown* v. *McGran*, 14 Pet. 479; *Brander* v. *Phillips*, 16 Pet. 121; *Feild* v. *Farring-ton*, 10 Wall. 141; *Oliver* v. *Moore*, 12 Heisk. 482. It is true, these cases speak of the factor's "lien" as a "special property" in the goods, but it is easy to see on reading them that what is meant is a right to sell, and the only "property" there is depends on that bare right, and nothing more. The factor is none the less selling for his customer, and only his customer's property in the goods, and in no sense his own, when he has made advances, than when he sells without having made advances, as I understand all the cases. In other words, he is none the less "a simple agent to sell" in the one case than in the other. When, there-fore, the defendants sold this cotton, they did not, because of this pos-sessory right which they supposed they had, assume any ownership over or interest in the cotton of any kind whatever, inhering in it as a prop-erty, but only held a possession which they supposed gave them the right to sell, or a "lien," so called. It was the same right to sell which was conferred by the original "commission to sell," and the factor's "lien" did not add anything to it or take anything from it. The only effect of the "lien" for the advances was that it somewhat qualified or restricted the customer's right to withdraw the power of sale already given, or to give instructions which would defeat the factor's privilege of selling the goods according to the uses of trade, in order that through that privilege he could secure himself for the advances. This, and nothing more; and it is a very slender thread upon which to hang the notion of "a special property." *Brown* v. *McGran, supra*, (10 Law Ed. 550, and note.) The essential element of a conversion—self-appropriation, namely—was, therefore, entirely wanting, in my judgment.

As to the commissions and charges for interest, *eo nomine*, on the money advanced, if the defendants had tendered those sums to the plaintiffs upon their demand for the proceeds, there could have been, in this view, no conversion because of that detention. Surely they should not be held for a technical conversion of the whole amount of cotton, because of this partial conversion of a few dollars of the proceeds after the sale. That was a conversion of those few dollars only retained out of the proceeds. There is more reason for holding them for a full conversion of the entire quantity of cotton because of their refusal to surrender the four bales act-ually on hand when the plaintiffs' notice and demand came to them, and their subsequent sale of those bales, and retention of the proceeds, as against plaintiffs' claim. But, as I look at it, in the ordinary course of business, as shown by the proof here, this lot of cotton was sold, as other cottons are, parcel by parcel, one or more bales at a time; and the transaction really answers the ends of full justice by segregating each parcel into a separate sale, and thereby we are enabled to likewise parcel out the facts, and treat these four bales as separately converted, as of themselves alone, just as it would have been if Samuels had shipped the cotton to defendants in sepa-

rate lots, and at different times. There is no principle to require us to administer any harsher rule on the facts of the case, although under other circumstances not admitting of this process of segregation, a conversion of a part is in law tantamount to a conversion of the whole. So considered, we might enter judgment for the part converted, and excuse the defendants as to the rest.

But all that has been said applies as to the leading question in the case only by ignoring, in the interest of the plaintiffs, the facts bearing upon the attitude of Samuels in his relation of master of the vessel upon which the fire occurred that damaged this cotton while it was *in transitu*, under a through bill of lading calling for a combined and continuous transportation by land and water to its destination in Cincinnati. This is a very peculiar state of facts, and distinguishes this case from those already considered. In that relation Samuels may belong to a very different class of bailees than that to which it has heretofore been assumed, in favor of the plaintiffs, that he belonged. The circuit judge has ruled that the conditions under which, by the maritime law, a master has implied power to sell a cargo which has been damaged in his hands, are not shown by the proof in this case. Unfortunately the proof has not been taken with a view of showing the facts with precision as to Samuels' conduct as master of the vessel, the defense having proceeded almost exclusively upon an implicit reliance on the case of *Roach* v. *Turk, supra,* as a protection to the defendants. One of the defendants on the stand testified to what was no doubt the fact, that Samuels was not known to him as master at all, and that he was supposed by the defendants to be the owner of the cotton. But, as I view it, this is quite immaterial, since the defendants are not to be tried for their state of mind upon this subject, and would be protected by the facts relating to Samuels' power and duty as master, when ignorant of them, quite as effectually as if they knew of their existence. It is true, they could not, perhaps, rely upon any equitable doctrine of an estoppel *in pais* if they did not act upon a knowledge of the facts on which they rely for the estoppel; but, as I have intimated before, in this class of cases such reliance is perhaps unnecessary. Again, considerable stress is laid upon the fact that Samuels assumed to act as owner, and not as master, and from this the circuit judge infers the fact that he was a wrong-doer *ab initio*. Now, I am not aware of any principle of law that requires the master undertaking the sale of a damaged cargo to proclaim himself as master in dealing with the goods in order to give effect to his sale, but, on the contrary, though he assume to be owner in dealing with it, his sale would be good if, on the facts, he had a power of sale. He might have supposed that, since he was master in fact, it was not therefore necessary to proclaim it, or disclose it in his dealings. The truth is that everybody seems to have assumed that Samuels was an embezzler, and was acting fraudulently about this cotton from the beginning,—the defendants not seeming to be concerned as to this, since they relied on the notion that, whether he was or not, they were protected,—but this may be a somewhat gratuitous assumption on the facts of this case, meagerly appearing as they do. It

is not even shown what he did with the money,—whether he appropriated it to his own use or to the uses of his owners, by repairing the vessel, for instance, or for their benefit, mistakenly or not. If he supposed, either rightfully or wrongfully, that he might use it upon a general average of the losses, or for repairs of his vessel, or some such use, it would relieve the case of this somewhat gratuitous assumption that he originally intended by sending the cotton to Memphis to the defendants for sale to convert it to his own use; or furthermore, it is possible that his original intentions were good, and that his real assumption was that he had the power, and that it was his duty, as master, to sell this damaged cotton, so commingled in its injured condition that its ownership could not be identified, or the relative rights of the parties determined without such a sale, and that he still claims to retain the proceeds upon some such theory as this for a proper adjustment under the maritime law of the rights of the parties, including his owners. Perhaps he is wrong in this, but that is not the question, as I shall endeavor to show presently. And I think this is just as fair an inference from the few facts we have as that which is drawn from the single fact that he acted as owner of the cotton apparently; for, as before said, if he acted as master in fact, he need not have proclaimed that relation to add anything to his power or duty, and took nothing from that power or duty by neglecting to proclaim himself as master. The cotton was burned upon the vessel, and became indistinguishable. He forwarded all that was not burned to its destination, and no complaint is made as to that, the plaintiffs receiving 45 bales of this shipment, according to the contract of carriage. He could have assumed ownership of those 45 bales as well as these, if his intentions were dishonest at the beginning; and the fact that he did not do this fairly implies that he regarded himself as charged with some special duty as to the burnt cotton, and did not intend to steal it, although he assumed in his dealings with it to be its owner. Again, whatever may be said of the position taken by the circuit judge when he segregates this bit of water voyage from the entire route of transportation upon a through bill of lading, and finds that the vessel had, at Chattanooga, arrived at her destination within the purview of the maritime law, so that within the same purview the master then had and could have no implied power of sale because of the damage, the fact remains that Chattanooga was not the destination of this cotton under the terms of the bill of lading, but that Cincinnati was that destination. It was not consigned to any one at Chattanooga, and perhaps his strict duty was to tender it to the railroad company whose contract, jointly with himself or his owners, was to carry it to Cincinnati. I think it is a fair inference that, since they took the other cottons, they either refused this because it was in a damaged condition, was commingled in its ownership and indistinguishable as to its shipping marks and symbols, or else, at least, that Samuels supposed they would not receive it. It is not specifically proved, but we may have, from a judicial knowledge of current history, information of the fact that Memphis is an extensive cotton mart, while Chattanooga is not, and it is not an unreasonable inference from the

fact that the facilities there for picking over a mass of burnt cotton, repacking and repairing it for marketable use, were greater there than at Chattanooga, and that this influenced Samuels' conduct in dealing with it under his wrongfully assumed—it may be—powers as master. It is said that his duty was, on arriving at the end of his voyage, to notify the owners or consignees, and that whenever this can be done he may not sell at all as master. He could have done this as well from the nearest postal or telegraph office to the place of disaster as at Chattanooga. I have not followed out the cases to see whether this rule of a termination of the implications of a power of sale by the arrival of the vessel at her destination, and the then imposed duty of notification to owners, applies to such bills of lading as this, which are somewhat anomalous, and of modern use in maritime law, or whether the rule is confined to purely maritime contracts of affreightment, where the consignee is usually found, or some agent for him, also, at the place where the voyage ends. These consignees were in Cincinnati, and it may be, if we are to cut out the bit of water route and treat it independently in its relation to the law of this case, that the railroad company or its agents at Chattanooga, were, *pro hac*, the consignees as to this master, or the agents of such consignees, and that notification to them was all that was required under the maritime law, and that their refusal to receive the damaged cotton entailed on the master the duty of warehousing it or possibly of selling it for account of whom it might concern, according to his best judgment, as any other bailee may sometimes do in that emergency.

At all events it does not seem to me that so much should be implied in favor of a liability against defendants from the bare fact that Samuels assumed to be owner, and that they dealt with him as such; and all the circumstances and inferences I have just mentioned seem to me to bring the case fairly within the rule of *Lickbarrow* v. *Mason*, 2 Term R. 70, "that wherever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." Id., 1 Smith, Lead. Cas. 1147. And this rule is fully recognized by the supreme court of the United States. *Steam-Boat Co.* v. *Van Pelt*, 2 Black, 371. It is not neccessary, in my judgment, that the defendants should establish a state of facts which would absolutely create a power of sale by implication, so that under the maritime law a purchaser from the master would acquire a good title as against the owner. That would be full protection, assuredly, but something less may be also, if not for a purchaser, who must claim under his title, or by estoppel against the real owner equivalent to a good title, yet for the mere agent of the master, employed by him to make the sale under a mistaken belief that the given facts conferred that power on him. That would be only a mistake of judgment on the part of the owner's agent, for which the owner himself should suffer, rather than an innocent broker, employed by that agent to sell that which the agent believed or assumed that he might sell. The facts here were in their character of the kind to raise the power *prima facie*, and might be readily mistaken for the very facts or circumstances under which the power would exist. In *Smith* v. *Martin*, 6 Bin. 262, in

a suit against the master himself, he was held not liable for acting under a mistaken judgment on the facts, which he supposed authorized him to sell; surely, his broker cannot be made liable. Said Mr. Justice BLACK-BURN in *Hollins* v. *Fowler, supra,* 766,—and it should be remembered that he was with the majority holding the defendant to the most rigid rule of liability against the dissent of Mr. Justice BRETT and his associates:

"I cannot find it anywhere distinctly laid down, but I submit to your lordships that, on principle, one who deals with goods at the request of the person who has the actual custody of them, in the *bona fide* belief that the custodier is the true owner, or has the authority of the true owner, should be excused for what he does if the act is of such a nature as would be excused if done by the authority of the person in possession, if he was a finder of the goods, or intrusted with their custody. I do not mean to say that this is the extreme limit of the excuse, but it is a principle that will embrace most of the cases which have been suggested as difficulties."

Now, that principle protects the defendants here, in my judgment, in the case where the master of a vessel, finding himsef, under the peculiar circumstances of this case, in possession of a portion of his cargo that has been injured by fire, so that the ownership is indistinguishable, and the mass unrecognizable in its shipping marks, etc., and the damage of such a nature that the rights arising concerning it out of the disaster are peculiar and liable to disputes, as they are under maritime law, and the goods are of such kind that they require especial handling to make them salable, supposes that he has the power to sell for account of whom it may concern, and proceeds to do that thing reasonably. And I hold that, if his judgment be at fault as to his power, and he misconceives his duty in the premises; or if he become fraudulent in his intentions, and takes advantage of his possession and *prima facie* appearances of right to sell,—his bailor must suffer the consequences, and not a mere broker for sale whom he employs to sell the damaged goods for him, and who is ignorant of all knowledge of wrong-doing on his part. The bailor may pursue the master, or the vessel and its owners, or the purchaser of the goods, if he have acquired no title by estoppel *in pais* or otherwise, but he cannot pursue a bare agent to sell, who has never acquired any title to or interest in the goods of a kind called a "property right," nor claimed any such title or interest, but only, at most, has claimed a right to keep possession until his advancements were paid, and who has sold and paid over the proceeds to the master before he has any knowledge of the adverse claim of that master's bailor that the master had upon the facts no right to act in that way, and sell the goods.

And I wish here to call attention to the fact that in the judgment ordered by the circuit judge it becomes necessary to divide, according to percentages of value, the gross proceeds of goods that were so commingled by the damage that the plaintiffs cannot identify their goods, even now. Without the necessary identification, how could their demand to surrender the cotton to them be complied with, either by the master or his agent, if it had not been then sold? And, if not, how could the refusal be a conversion technically? And might not the mas-

ter be excused for any error of judgment·in supposing it were best to rebale the burnt cotton, and sell it all together for distribution? Who knows that he is not willing and ready to make that distribution, and pay over the proceeds on demand? I regret that the proof is so meager on this branch of the case, but the implications and inferences are, in my opinion, not at all in favor of the assumption of fact that the master was *ab initio* a thief or embezzler of this cotton, whatever he may have become afterwards by a misuse or wrongful withholding of the money paid to him as its proceeds,—if there has been any such misuse, which has not been proved, but only taken for granted, because defendants supposed they were protected from liability in any event, and whatever he may have done.

My conclusion is that the judgment should be for the defendants absolutely, because, as to the four bales of cotton on hand when notice of plaintiffs' claim came, they were not the entire owners, and only had an undivided interest incapable of separation, and therefore a refusal of their demand did not amount to a conversion as to those four bales. Whether *assumpsit* would lie after sale for plaintiffs' share of the proceeds of those four bales, I am not sure, but think possibly not, for the same reason of a want of identifying their property. But at most they could be liable only for plaintiffs' share of those four bales, and the charges and commissions retained by defendants.

If any apology is needed for the extent of this opinion it must be found in the confused state of the authorities, the unaffected deference I have for the opinion of the learned circuit judge, the great reluctance I feel in stating this dissent at all, the necessity that is upon me for justifying it as best I may, and a firm conviction that, notwithstanding the array of opinions to be produced that may be thought to be, and perhaps are, to the contrary, the defendants are not liable upon the true principles of law, as I understand them. The supreme court of the United States ought to be asked to settle the questions of this case, and only because they have not heretofore had occasion to do so, do I consent to a dissent, the first, I believe, except *pro forma*, since I have been in this court.